583 A.2d 414

MIKHAIL VASILEVSKY AND KLAVDIA VASILEVSKY, HIS WIFE, PLAINTIFFS-APPELLANTS, v. RICHARD M. CHOPIN, M.D., DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted November 20, 1990—Decided December 14, 1990.

Before Judges MICHELS, BRODY and D'ANNUNZIO.

*Stuart M. Kurtzer, P.A.,* attorneys for appellants (*Stuart M. Kurtzer,* of counsel, and *Stuart M. Kurtzer* and *John L. Shanhan,* on the brief).

*Michals, Wahl, Silver & Leitner,* attorneys for respondent (*Sheldon Schiffman* and *Christopher G. Aiello,* on the brief).

The opinion of the court was delivered by

**BRODY, J.A.D.**

The issue raised in this appeal may be demonstrated by an imaginary, though not fantastic, exchange between a trial attorney and a testifying witness:

Q.  Was the traffic light red?

A.  No.

The witness's meaning is certain.  However, the witness's meaning would be uncertain if the question and answer were as follows:

Q.  Was the traffic light not red?

A.  No.

The answer could mean, "No, the traffic light was not red." Or, taken literally, it could mean, "No, the traffic light was not not red."  In common usage, however, one does not describe a red light as a "not not red light."  In the example given, after hearing the witness's terse answer, the attorney would ordinarily realize that his question was faulty and ask the witness to clear up the meaning of his answer.

The insertion of the mischievous word "not" in a special interrogatory to the jury produced a similar quandary in this medical malpractice action, but the trial judge did not ask the jury *sua sponte* to clarify its answer.  Instead, without objection from plaintiffs' attorney, he entered judgment for defendant.  The judge later denied plaintiffs' motion for a new trial, ruling that the jury's "no" answer to the negative question must be taken literally.  We reverse and remand for a new trial.

Because the issue on appeal lies outside the factual and legal issues that were tried, we have not been provided with a transcript of the trial except for the judge's instructions to the jury and the post-trial proceedings.  Our understanding of the trial issues is therefore sketchy.

It appears from colloquies in the transcripts that for most of his life plaintiff Mikhail Vasilevsky (plaintiff) suffered from an ocular condition commonly referred to as being cross-

eyed. Defendant undertook to perform surgery that would correct the condition cosmetically, but would not restore binocular vision. Defendant informed plaintiff that the operation would produce brief double vision until his brain suppressed the visual images received by the errant eye. The basis of the malpractice claim is that defendant failed to inform plaintiff of the risk that the double vision would be permanent. Plaintiff's wife asserts a *per quod* claim.

With the consent of the parties' attorneys, the judge put the following written special interrogatories to the jury:

1. Did Dr. Chopin fail to give the plaintiff all the information that a reasonable person in the patient's position would expect a doctor to disclose in order that the patient might make an informed decision.
   YES____ NO____
If no, cease deliberations and return your verdict.

2. If yes, did the undisclosed risk of permanent double vision occur and harm the plaintiff Michael Vasilevsky.
   YES____ NO____
If no, cease deliberations and return your verdict.

3. If yes, would a reasonable person under the circumstances of this case *not* have consented to the surgery, had he been so informed. [Emphasis added.]
   YES____ NO____
If no, cease deliberations and return your verdict.

4. If yes, was the surgery a proximate cause in producing the injury to plaintiff.
   YES____ NO____
If no, cease deliberations and return your verdict.

5. If yes, damages to be awarded plaintiff
   Michael Vasilevsky    $_____
   Claudia Vasilevsky    $_____

The jury answered "yes" to interrogatories 1, 2 and 4. However, it answered "no" to interrogatory 3, the interrogatory in question. It awarded plaintiff $100,000 damages and his wife $10,000 damages.

It was not immediately apparent that the jury had answered more than the first three interrogatories. When, after the forelady had reported the jury's answer to interrogatory 3, the clerk inadvertently asked for the answer to interrogatory 5, the judge interrupted and there was the following exchange:

THE COURT: No. The instructions were if they received a no vote, they were to cease deliberations and return your verdict.

[PLAINTIFF'S ATTORNEY]: Was there an answer to four? I get the impression it was and—

THE FORELADY: [The clerk] didn't ask me about four.

THE CLERK: Because she answered no.

THE COURT: That is correct. The instructions were to question one, if you answer yes, then you go on. Question two, if your answer is yes—let me have the question sheet. [The judge then read aloud the first three interrogatories as they appear on the special interrogatories form, including the instruction to cease deliberations if the answer to interrogatory 3 was "no".] Is that what you've done?

THE FORELADY: Yes.

THE COURT: All right. So you ceased your deliberations at the end of question three by answering question three with a no.

THE FORELADY: Correct.

THE COURT: All right. And you have no answers to question four as it was supplied before by the, you have not answered any other questions?

THE FORELADY: Well, we did because we weren't sure.

THE COURT: Oh. All right....

The judge did not ask the forelady what the jury was unsure about. Instead, he merely polled the jury to confirm that the forelady had correctly reported the jurors' "no" answers to interrogatory 3.[1] The judge and both attorneys were satisfied that based upon the jury's "no" answer to interrogatory 3, judgment should be entered for defendant. The judge then excused the jury.

Twenty minutes after the attorneys and the jury had left the courtroom, a court attendant told the judge that one of the jurors had just engaged him in conversation. The judge reported the conversation to the attorneys in open court two days later as follows:

Mr. Restivo, my court aide, came back around 20 minutes later, after you had left, meaning counsel had left, and the parties had left, and after the jurors had left, and informed me that one of the jurors had pulled him aside or had spoken to him and informed him, and the question was realistically phrased as; how come the judge didn't ask us the rest of the questions.

And certainly at this point I had known that they had answered more questions. And the court aide told him; after you reached no, you were

---

[1]One juror had answered the interrogatory "yes."

supposed to cease deliberations and return your verdict. To which the comment was passed to Mr. Restivo that "I guess we fouled up."

Now, the correct word began with an F, and was six letters. I choose not [sic] to rephrase it for the record. But that was the expression that was used, and there was no further discussion, certainly, and they all left.

This incident caused the judge and the attorneys to realize that they may have misunderstood the meaning of the jury's "no" answer to interrogatory 3. They· all agreed, however, that without the consent of all parties it was too late to reassemble the jurors to learn from them how they had understood the interrogatory and what they meant by their answer. *Menza v. Diamond Jim's, Inc.*, 145 *N.J.Super.* 40, 44–45, 366 *A.*2d 1006 (App.Div.1976). Defendant's attorney would not consent.

A month later the trial judge denied plaintiffs' motion for a new trial based on the allegedly faulty construction of interrogatory 3. The judge reasoned that by his polling of the jury respecting their reported answer to interrogatory 3 the jurors "indicated that that was their answer." He also noted that "the questions were agreed upon by counsel and the Court, albeit they were modifications of my questions." [2]

The jurors' acknowledgment, when polled, that the forelady had correctly reported their "no" answers to interrogatory 3 does not reveal what the answer means. Reverting to the example given at the beginning of this opinion, we cannot tell whether the "no" answer meant, "No, a reasonable person would not have consented to the surgery" or, as the judge ruled, "No, a reasonable person would not not have consented to the surgery." Although the latter meaning may be literal, it is contrary to common usage, and is inconsistent with the fact that despite the "no" answer the jury continued its deliberations, ultimately awarding plaintiffs damages. It may also be

---

[2]There is a suggestion in colloquies that defendant's attorney had persuaded the judge to adopt the interrogatories in the form used in order to preserve their symmetry. The word "not" was inserted in interrogatory 3 so that a "yes" answer to every question would lead to the next question, and a "no" answer to any question would mark an end to the jury's deliberations.

argued that the juror who commented to the court attendant after trial that something had gone wrong, used strong language because he was concerned that the wrong result had been reached, not simply that the jurors had decided more issues than necessary.

In view of the inherent and circumstantial ambiguity attached to the meaning of the jury's answer to interrogatory 3, plaintiffs are content to have the matter retried rather than press for the meaning that favors them. We agree that a new trial would satisfy the interests of justice.

By consenting to the form of interrogatory 3, plaintiffs' attorney did not waive his clients' right to complain that the trial court erroneously interpreted the jury's answer to favor defendant. The problem is that the form of the interrogatory, consented to by both attorneys, does not permit the jury to give a negative answer that discloses whom it favored.

As with a witness's "no" answer to a negatively phrased question, a jury's "no" answer to a negatively phrased special interrogatory is meaningless.

Reversed and remanded for a new trial as to all issues.