690 A.2d 575

SONS OF THUNDER, INC., PLAINTIFF–APPELLANT,
v. BORDEN, INC., DEFENDANT–RESPONDENT.

Argued December 2, 1996—Decided March 11, 1997.

*Richard L. Bazelon* argued the cause for appellant (*Bazelon & Less*, attorneys; *Mr. Bazelon* and *Helen Heifets*, on the briefs).

*Peter J. Pizzi* argued the cause for respondent (*Connell, Foley & Geiser*, attorneys; *Mr. Pizzi* and *Richard T. Bayer*, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns a breach of contract action and is before us as a matter of right. *R.* 2:2–1(a)(2). The jury held that Borden, Inc., defendant-respondent, breached its contract with Sons of Thunder, Inc., plaintiff-appellant. Borden moved for a judgment notwithstanding the verdict, which the trial court denied. We must decide whether the majority of the Appellate Division properly found that the trial court erroneously denied Borden's motion for a judgment notwithstanding the verdict. 285 *N.J.Super.* 27, 666 *A.*2d 549 (1995). We find that the trial court was correct in denying that motion. Therefore, we reverse the Appellate Division.

I

Before examining the facts, it is important to understand that the parties view this appeal differently. Plaintiff believes that Borden breached the contract in two ways: (1) by terminating the contract contrary to the termination clause; and (2) by breaching the implied covenant of good faith and fair dealing in *performing* the contract. Plaintiff asserts that three corporations, Sons of Thunder, Inc., Sea Labor, Inc., and Sea Work, Inc., all owned and operated primarily by Donald DeMusz, were so interrelated that Borden's course of conduct with each should have been presented to the jury to enable it to determine whether Borden breached the

implied covenant of good faith while performing its obligations. The trial court agreed and permitted the case to go to the jury on that basis. The dissent in the Appellate Division also agreed with that position. For Borden and the majority of the Appellate Division, however, the sole issue was whether the implied covenant of good faith and fair dealing can override an express and unambiguous termination clause in a contract. That position focuses only on whether Borden breached the express terms of the termination provision and ignores the fact that a party's performance may breach the implied covenant of good faith and fair dealing even when termination of the contract itself does not violate the termination provision.

With those two views in mind, we present the facts in chronological order.

### A.

*Initial Dealings—Sea Labor, Inc. and Sea Work, Inc.*

Borden owned Snow Food Products Division, a leading producer of clam products, namely Snow's Clam Chowder. Borden obtained shell stock of ocean quahog clams (clams) from its own four-vessel fleet and from independent boats. Borden's policy was to attempt to fill its need for clams from its own boats first and then to obtain clams from independent boats to fill any additional need. The boats delivered the clams to Borden's Cape May Plant, where the shell stock was processed into clam meat. The meat was then shipped to Pine Point, Maine, where the final product was made and canned.

In 1978, Borden hired Donald DeMusz to be the captain of the *Arlene Snow*, which was one of the four boats that Borden used to harvest clams. In 1983, Wayne Booker, Group Operations Manager in charge of Snow Food Products, Kava Instant Coffee, and 'Bama Food Products, negotiated with and later entered into a charter agreement with DeMusz whereby DeMusz would manage Borden's four boats. DeMusz formed Sea Labor, Inc. to manage

Borden's boats. The agreement provided that Sea Labor would receive five cents per bushel of clams harvested by the fleet. DeMusz would still receive captain's compensation for his work on the *Arlene Snow*.

Around the same time, Borden began to implement a long-considered project called "Shuck–at–Sea," which would enable the fishermen to shuck the clams on the boat and thereby provide a bigger haul of clams per boat trip. Borden developed the project because it would increase the return on its investment through reducing costs, would eliminate disposing of shells and visceral materials on land by returning them directly to sea, and would eliminate the need to drill a new freshwater well at the Cape May Plant. DeMusz was involved in developing the Shuck–at–Sea project. Borden initially planned to place its shucking equipment on the *Arlene Snow*, but it was too small.

Booker and DeMusz discussed the problem. DeMusz offered to buy a large boat, to rig it to Borden's specifications, and to use it in conjunction with Borden for the Shuck–at–Sea project. Booker determined that an agreement with DeMusz would save Borden money. Moreover, he did not think Borden would generate a high enough return on its investment if it bought the boat itself.

Following a meeting where Booker and other executives approved DeMusz's proposal, DeMusz formed Sea Work, Inc. with two partners. Sea Work purchased and operated a clam-fishing boat named *Jessica Lori*. Purchasing and rigging the *Jessica Lori* cost Sea Work $750,000, which it financed through a bank loan. Although DeMusz did not want to "double-rig" the boat, he acquiesced to Borden's demands to do so.

During the negotiations, Booker wrote Herbert A. Southwell, Group General Manager, an inter-company memorandum, describing how a contract with DeMusz would save time and money:

[W]e still have a significant mutual interest with DeMuse [sic]. His principal business will still be in chartering the Snow fleet and in captaining Arlene. He needs a dependable customer for the clams that he catches, either shell stock or meat. If we terminate our agreement with him, he would have a hard time making the payments on his boat.

On July 11, 1984, Sea Work and Borden signed the "Equipment Lease," an eleven-page contract, which provided that Borden would place its shucking equipment on the *Jessica Lori* in exchange for Sea Work offering to Borden all the clam meat shucked by the *Jessica Lori* at fifty cents per pound. The lease required the *Jessica Lori* to offer Borden a minimum of 15,000 pounds of clams each week.

Initially, the equipment was to be installed by the end of 1984. Problems with the equipment developed on several occasions, however, and the *Jessica Lori* was not functioning as a Shuck–at– Sea vessel until late 1986.

## B.

### *Sons of Thunder, Inc.*

In August 1984, Booker and DeMusz began negotiations about DeMusz purchasing a second boat that would provide clams to Borden. If the Shuck–at–Sea project was successful, Borden would want a second vessel shucking at sea. Moreover, a second large boat would give Borden the advantage of receiving clam meat in bad weather because small boats generally cannot go out to sea in bad weather. Finally, Borden wanted to ensure that it received a certain amount of clams if the National Fisheries Advisory Council implemented annual limits on the amount of clams a boat could harvest.

Booker, on behalf of Borden, and DeMusz entered into an oral agreement, which gave DeMusz a long-term supply contract for the second boat. Borden's accounting manager helped DeMusz calculate how many bushels would have to be sold and how much revenue would have to be generated to support DeMusz's financing of the second boat. Booker, with Southwell's knowledge, wrote DeMusz a letter of intent to help DeMusz obtain financing.

DeMusz drafted a one-page contract by himself and sent it to Booker, who approved it with one minor change. According to

Booker, the contract memorialized his oral agreement with De-Musz.

DeMusz, along with Bill Gifford and Bob Dempsey, formed Sons of Thunder, Inc. to buy the second boat. Dempsey was the manager of Borden's Cape May Plant and was responsible for buying quahogs for Borden. Dempsey failed to disclose his interest in Sons of Thunder on his annual statements affirming that he had no undisclosed interest in any of Borden's suppliers. Despite his conflict of interest, Dempsey did not appear to favor Sons of Thunder, and the trial court instructed the jury not to consider his undisclosed conflict of interest as part of Borden's defense or as to the issue of fraud.

On January 15, 1985, Booker signed the contract with DeMusz, Southwell approved it, and Borden's legal department initialed it. That contract is the focus of this appeal. The contract was to begin when the boat was ready to operate. The one-page contract provided:

> IT IS understood and Agreed to by the parties hereto that Snow Food Products shall purchase shell stock from Sons of Thunder Corp. for a period of one (1) year at the market rate that is standardized throughout the industry. The term of this contract shall be for a period of one (1) year, after which this contract shall automatically be renewed for a period up to five years. Either party may cancel this contract by giving prior notice of said cancellation in writing Ninety (90) days prior to the effective cancellation date.
>
> Sons of Thunder Corp. will offer for sale all shell stock that is landed to Snow Food Products with Snow Food Products having first right of refusal, but it is agreed upon that Snow Food Products will purchase at least 240 cages of ocean quahogs per week or 7,680 bushels of ocean quahogs, with the exception of annual plant shutdown and unforeseen plant shutdowns.

In March 1985, Sons of Thunder bought a boat, which it named *Sons of Thunder*. The cost to rig and purchase the boat was $588,420.26. Sons of Thunder sought financing from First Jersey National Bank, but was unable to obtain a loan until Booker intervened in the negotiations. Booker told the representative of the bank that DeMusz had a solid relationship with Borden and that although the contract could be terminated within one year, Borden expected the contract to run for five years. Moreover, Booker explained to the representative that the five-year term of

the contract would be sufficient to pay back the loan. Ultimately, DeMusz obtained a $515,000 loan, which he, Gifford, Dempsey, and their spouses personally guaranteed. DeMusz used a personal note to cover the remaining balance.

The boat was not ready to fish until February 1986. After some preliminary testing, the *Sons of Thunder* started to operate and to fulfill its contract with Borden. For most weeks, the records show that Borden did not buy the minimum amount specified in the contract.

## C.

### *Delay in Shuck–at–Sea Project*

During the time DeMusz and Borden were negotiating about the contract with Sons of Thunder, the parties discovered that Borden's equipment would not work on the *Jessica Lori*. In April 1985, Borden went aboard the boat to try to get the equipment working. By September 1985, it became clear that the shucking equipment needed to be redesigned in order to work on the *Jessica Lori*. Thus, the equipment was removed to be reconfigured, and the ship went back to harvesting clams.

During the five months that Borden was aboard the *Jessica Lori*, the boat was unable to harvest clams, and therefore generated no income. Prior to signing the Equipment Lease, DeMusz and Booker had discussed payments from Borden to DeMusz to cover "downtime" while the equipment was installed. Later, Booker memorialized that agreement in writing, promising to pay DeMusz $8,500 for each week the *Jessica Lori* was unable to fish because of the installation. Southwell received a copy of the writing. Borden had enough money budgeted to pay Sea Work approximately $25,000.

Once those funds were spent, Booker, Southwell, and DeMusz had a meeting and decided that Borden would "advance" $125,000 to Sea Labor, DeMusz's managing company, to cover his operating costs. The written terms of the advance provided that there

would be no interest and that DeMusz would not be personally liable. Sea Work would pay Borden back at a rate of ten cents per pound of meat harvested from the *Jessica Lori.* However, the new agreement provided that Sea Work would be permitted to charge Borden sixty, rather than fifty, cents per pound until the advance was paid back.

In addition to reconfiguring the equipment, the *Jessica Lori* had to be rerigged. In February 1986, the *Jessica Lori* stopped harvesting clams and was brought to a shipyard to be rerigged for the Shuck–at–Sea project. The rerigging cost $350,000, for which Sea Work had to seek financing.

### D.

#### *Change in Borden's Management*

Around the time Borden attempted to install the equipment on the *Jessica Lori,* it had some changes in its corporate structure that had a major impact on DeMusz's contracts. First, Booker left Borden on October 1, 1985, and was replaced by William Gallant, who was named Group Operations Manager on May 1, 1986. Gallant testified that he was unaware of Borden's contract with Sons of Thunder when he came on the job in late 1985. Second, in May 1986, Southwell retired and was replaced by Robert Culver, who eventually became General Manager in August 1986. Culver testified that he never read the Sons of Thunder contract, and that based on information provided by Gallant, he believed that the contract gave Borden a right to first refusal. He did not know that Borden was obligated to purchase a minimum amount until the day before the trial.

During the spring of 1986, Gallant supported DeMusz's proposal to the bank for a loan that would finance the rerigging costs for the *Jessica Lori.* The proposal contemplated that the loan would be made to Sea Labor, DeMusz's management company. The proposal outlined Sea Labor's income streams, which included the contract between Borden and Sons of Thunder, management fees,

and catches made from the *Jessica Lori.* Southwell approved the proposal, and Gallant, who was aware that the loan proposal included the contract with Sons of Thunder, signed it on behalf of Borden on May 15, 1986. The bank agreed to loan Sea Labor $150,000, which left Sea Work $200,000 short of the rerigging cost.

Gallant testified that he first became aware of the contract with Sons of Thunder during that application. He told DeMusz that he did not intend to honor the contract and would not purchase the specified minimum in the contract. DeMusz testified that he showed Gallant the contract in the early spring of 1986 because Borden was not purchasing the amount required by the contract. DeMusz also testified that Gallant said that he was unaware of the contract and did not intend to abide by it.

Despite Borden's failure to honor the contract with Sons of Thunder, DeMusz continued to pursue a loan that would finance the rerigging of the *Jessica Lori.* In November 1986, DeMusz, with Borden's knowledge, obtained a $200,000 loan for Sea Work from Sons of Thunder, which had borrowed the money from First Jersey National Bank. To secure the loan, Sons of Thunder had to guarantee every loan Sea Work had undertaken for the *Jessica Lori.* That guarantee exceeded $750,000. In conjunction with its own loans, Sons of Thunder had loan guarantees in excess of $1,000,000, and DeMusz was personally liable for over $800,000. In addition, DeMusz, Gifford, Dempsey, and their spouses had to personally guarantee the $200,000 loan. Finally, the bank required that there be unity of ownership between the different corporations. Thus, Gifford and Dempsey bought out DeMusz's other two partners in Sea Work. After the rerigging was completed in November 1986, the Shuck–at–Sea project got off to a successful start.

However, the success was short-lived because Borden acquired Doxsee, a Delaware seafood company, at the end of 1986 and brought Robert Nicholson from Delaware to Cape May to replace Dempsey as the plant manager. Dempsey was demoted to Boat Manager. Nicholson extorted kickbacks from independent suppli-

ers, and Borden later fired him for that reason. Nicholson tried to get Dempsey to cooperate in the kickback scheme, but Dempsey refused and disclosed his interest in the *Sons of Thunder*. In the meantime, DeMusz told Gallant about Nicholson's propensity for taking kickbacks. Nicholson reprimanded DeMusz for going over his head. Nicholson, like Gallant, also told DeMusz that he would not honor the contract with Sons of Thunder. In fact, after Nicholson arrived, Borden's purchases of shell stock from the *Sons of Thunder* and meat from the *Jessica Lori* decreased. Moreover, Borden lowered its price for clams caught by the *Sons of Thunder*.

Borden acquired two additional boats from Doxsee, and it appears that its need for independent harvesters diminished. In fact, Dempsey testified that the overall need for clams was declining. Finally, Doxsee brought along environmental technology that placated Borden's concern about the land-based shucking operation.

Shortly after the Shuck–at–Sea project got under way, Borden started charging Sea Work for the salt and carbon dioxide that the *Jessica Lori* used in conjunction with the shucking equipment. In addition, Borden stopped purchasing the processed clam meat from the *Jessica Lori*. When DeMusz tried to sell the clam meat to other suppliers, Borden charged Sea Work a rental fee for using the shucking equipment. None of those fees were included in the original contract with Sea Land. More importantly, Borden paid Sea Work sixty cents per pound for clam meat on only two occasions. In contravention of its written agreement, Borden paid only fifty cents per pound. Thus, the status of the "advance" had been altered. Gallant stated that the advance was invalid and that he would not honor it.

At the same time, Gallant began to pressure DeMusz to obtain outside financing to pay back the $125,000. By 1987, Borden sent the *Sons of Thunder* out only in bad weather. Nicholson believed that he could receive kickbacks if he made limited use of the *Sons*

*of Thunder.* Therefore, Borden was purchasing less than the contract required.

In February 1987, Nicholson informed management of Dempsey's interest in Sons of Thunder. Dempsey was fired. DeMusz testified that Gallant told him that the contracts would not be affected by Dempsey's dismissal. However, from February to April, Borden bought less clam meat from the *Jessica Lori* and the *Sons of Thunder.*

E.

*Termination Letters*

During the spring of 1987, Borden discovered that an accounting error of $500,000 had been made in calculating the Shuck–at–Sea project, and that the project would not be profitable. Two internal memos, dated April 2, 1987, and April 24, 1987, recommended that the Shuck–at–Sea project be abandoned.

On May 8, 1987, Borden sent both Sea Work and Sons of Thunder letters, notifying them that it was terminating the contracts. Both letters seemed to comport with the time limitations of the two contracts (sixty and ninety days respectively). Culver testified that Borden ended the contracts because DeMusz's credibility had been tainted by the Dempsey incident. However, Sea Labor, with DeMusz at the helm, remained as the manager of Borden's fleet into 1988. DeMusz testified that Gallant said that Borden was terminating the contract with Sons of Thunder because of a corporate decision.

Within ten days of the letters, Borden removed the cages from the *Sons of Thunder.* Within weeks, the boat was no longer sent out to harvest clams. After the contracts were terminated, no markets existed for the boats. Then, Gallant told DeMusz that Borden would continue to buy shell stock from the *Jessica Lori* if DeMusz was the only owner of the boat. In June 1987, DeMusz became the sole owner of the *Jessica Lori* and Gifford and Dempsey became joint owners of the *Sons of Thunder.*

Gallant told DeMusz that he would have to sign a promissory note covering the "advance" if he wanted to continue fishing the *Jessica Lori.* On July 28, 1987, DeMusz signed a promissory note making Sea Labor, Sea Work, and himself personally liable for the balance of the $125,000 "advance," which at that point was $96,-277.75. That note also carried an interest rate six points over the prime rate. DeMusz testified that "[he] was forced into paying something [he] didn't owe to continue working to survive."

Gallant told Nicholson to give the *Jessica Lori* priority over other independent boats. However, Nicholson did not follow that instruction until DeMusz paid him kickbacks (fifteen cents per bushel). Borden fired Nicholson in September 1987 for accepting kickbacks.

Eventually, DeMusz sold the *Jessica Lori* because of financial difficulties, and the buyer took over the note. DeMusz lost both his homes and was left financially devastated. Gifford and Dempsey moved the *Sons of Thunder* to Virginia to try to find a new market. They bought more boats before splitting their business in 1988. Gifford has been successful in the clam business, but he ultimately sold the *Sons of Thunder* because no market existed for such a large clamming vessel. He received $900,000, which enabled him to break even.

## II

### A.

### *Institution of Legal Action*

On April 4, 1990, Sons of Thunder filed its first complaint against Borden to recover for Borden's alleged breaches of contract. Initially, Sons of Thunder sought damages for: (1) Borden's failure to buy the contractual amount of quahogs and failure to pay the contractual price prior to the purported termination of the contract; (2) Borden's failure to buy quahogs after the purported termination; and (3) the decrease in value of the *Sons of Thunder* due to Borden's breaches.

On March 11, 1991, Borden filed a motion for partial summary judgment on the claim for damages for the period after August 8, 1987, on the theory that the contract with Sons of Thunder unambiguously gave Borden the right to terminate with ninety days notice. In response, Sons of Thunder submitted the affidavits of Booker and DeMusz, who negotiated the contract for the two parties. Essentially, both affidavits stated that the intention of the parties was that either party could terminate the contract at the end of the first year with ninety days notice, and if the contract was not terminated, the parties were locked in for five years.

Booker's affidavit stated that Borden agreed to a five-year term because its reason for entering the contract was to secure a reliable source of clams over the long-term. Booker noted that a Borden accountant had calculated the number of bushels that Borden was obligated to buy each week. That number was based on Borden's need and on the amount of income necessary for DeMusz to fund the debt on a new boat.

Booker explained that the contract allowed Borden to terminate at the end of one year, with ninety days notice, in case the boat became a non-performer. Booker stated:

> As long as DeMusz was ready, willing and able to supply the contractual number of clams, then I viewed Borden as committed to buying the contractual amount of clams over a five[-]year period. Borden wanted a steady supply of clams, and a long-term contract was the price we knew we were paying.

Booker said that they intended the contract period to begin when the *Sons of Thunder* was ready to harvest clams. Booker also stated that Southwell approved the contract.

Booker stated that he met with Sons of Thunder's banker, Dodson, at least twice:

> Dodson wanted Borden to commit to a term in the contract that was co-existent with the payout period for the proposed loan, that is, seven or eight years. I had already secured approval for the five-year term we had put in the agreement, and I wanted to convince Dodson that given DeMusz' excellent working relationship with Borden, a five[-]year term for the contract should be a long enough basis for him to make the loan. I also told Dodson that although the contract could be terminated

at the end of the first year for non-performance, we did not anticipate any performance problems, given DeMusz's excellent record.

DeMusz expressed the same understanding of the terms of the contract in his affidavit.

The trial court denied Borden's motion, finding that genuine issues of material fact existed "as to what the intent of the contract was" and about whether the written contract reflected "the full and complete agreement and understanding between the parties." The court further found that Borden's affidavits raised an issue of fair dealing. Subsequently, Sons of Thunder amended its complaint to add a cause of action against Borden for breaching its covenant of good faith and fair dealing.

Borden made a motion *in limine,* requesting that Sons of Thunder be precluded from introducing testimony at trial concerning the contract's termination provisions, from seeking damages for the period after August 8, 1987, and from introducing evidence relating to the relationship between Borden and Sea Work or kickbacks paid to Nicholson. Borden argued that the Court should enforce the contract as written and not admit parol evidence because the terms of the contract are clear and unambiguous. Borden contended that the terms of the contract preclude damages for the period after August 8, 1987.

The trial court denied Borden's motion. Ultimately, it found that the contract was not integrated, was ambiguous as a matter of law, and that its meaning was a question for the jury. The Appellate Division denied leave for an interlocutory appeal.

The trial court also struck Borden's defense of fraud in the inducement; i.e., that *Borden* would not have signed the contract if it knew that Dempsey was a part owner of Sons of Thunder. The Appellate Division denied leave to appeal that motion.

### B.

### *Plaintiff's Claims for Damages*

At trial, plaintiff called Sander J. Greenberg, a certified public accountant, to testify about the analysis he performed on Sons of

Thunder's damages. After reviewing all of Sons of Thunder's financial records and conducting interviews with DeMusz, Dempsey, and the corporation's accountant, Greenberg concluded that Sons of Thunder lost $326,292 in profits during the period between April 7, 1986, and August 8, 1987. Greenberg also estimated that Sons of Thunder's lost profits for the remainder of the five-year contract following Borden's termination were $1,545,690. Greenberg derived that figure by projecting how much Sons of Thunder would have earned each year. Those estimates ranged from $399,513 to $430,516.

In closing arguments, Sons of Thunder asked for $362,292 in damages for reduced sales during the period between April 7, 1986, and August 8, 1987. Sons of Thunder also asked for $1,545,690 in damages for lost sales in the period beginning with the purported termination of the contract and extending to the end of the five-year contract period claimed by plaintiff. In addition, plaintiff requested $2,589,522 in damages due to loss in value of the vessel because of the lost opportunity to establish a larger catch history before the implementation of the National Fisheries Council allocation system.

## C.

### *Jury Verdict Form & Verdict*

The jury verdict form divided the jury's deliberations into six major questions. Questions 1(a) and (b) asked the jury whether Borden breached the contract between April 7, 1986, and August 8, 1987, by purchasing less than the specified minimum of 7,680 bushels of quahogs per week and by not paying the specified price of fifty cents per pound. The jury answered in the affirmative and awarded Sons of Thunder $362,292. Questions 5 and 6 asked whether it was foreseeable that the Federal Government would institute a new allocation system that would cause Sons of Thunder to suffer a loss if Borden breached. The jury returned a verdict for Borden. Questions 1, 5, and 6 are not before the Court.

Questions 2, 3, and 4 are the focal point of this appeal. Those questions and the jury responses follow:

2. Do you find that defendant, Borden, Inc., breached the Contract with plaintiff, Sons of Thunder, Inc., by terminating the Contract by its letter of May 8, 1987?

YES ____ NO x

Vote 5–1

3. Do you find that defendant, Borden, Inc., breached its obligation of good faith and fair dealing to plaintiff, Sons of Thunder, Inc., in terminating the Contract by its letter of May 8, 1987?

YES x NO ____

Vote 6–0

If you have answered "No" to BOTH questions # 2 and # 3, cease your deliberations and advise the jury attendant that you have reached your verdict; if you have answered "Yes" to question # 2 and/or # 3, proceed to answer question # 4.

4. What sum of money, if any, expressed in a lump sum, will adequately and justly compensate the plaintiff, Sons of Thunder, Inc., for:

(a) Damages as a result of lost sales to Borden, Inc., if any

$ 412,000

Vote 5–1

(b) Damages as a result of lost sales to other processors, if any

$ 0

Vote 6–0

*See infra* at 415–20, 690 *A.*2d at 584–87 for a discussion of the trial court's instructions to the jury.

During its deliberations, the jury was confused on how to allocate damages under the first four questions. It asked: "[I]f we were to award money for lost profits from sales, can we also award damages based on breach of good faith and fair dealing for the same time period?" The jury foreperson clarified that the inquiry referred to the ninety days *after* the termination of the contract. The trial court determined that those ninety days were

included in the lost sales described in the first question's reference to Borden's failure to purchase the minimum amount of clams at the specified price. The court then stated that any alleged damages following that ninety days would fall under the claims relating to whether Borden did not perform in good faith or breached by terminating the contract.

## D.

### *Post–Verdict Motions*

Following the jury verdict, Borden moved for judgment notwithstanding the verdict (JNOV) on Question 3, arguing that a party cannot be held liable for breaching the implied covenant of good faith and fair dealing when the contract contains an express termination clause. In denying Borden's motion, the trial court explained its reason for preserving the claim for the breach of the implied covenant of good faith and fair dealing:

> The whole basis is going to be, are we talking about general conduct of the defendant of which the termination was a minor part and not the focus point in unfair—in breach of implied covenant of good faith, or are we—notwithstanding all of the history of the case and all of the conduct by the defendant, do we still have to focus and look solely on the termination? ... *[A]s I viewed the case, the focus wasn't necessarily on termination as it was a result of the manner in which the defendant carried out its obligations under the various contracts ....* The payback by the additional ten cents, whatever, on the bushel, the cost of the sodium, the cost of things that there started to be charged and assessed against the plaintiff after there was a change of management, the interest rate, the loan, and the interest rate over prime, all of that culminating in the termination. *I viewed it in that entire package, and I viewed it as all interrelated as far as the corporations and permitted the case to go to the jury in that concept....* But if [the Appellate Division] take[s] the position, as the plaintiff has and as I have, that you look at ... the termination as only being one of the aspects of the conduct, then, you know, I'm satisfied that I made the right determination.
>
> [ (Emphasis added).]

The trial court later denied Borden's motion to preclude Sons of Thunder from recovering damages for any period after August 8, 1987. The court then entered a judgment for Sons of Thunder of $326,292 plus $141,280.24 in prejudgment interest on the first

verdict and $412,000 plus $96,588.39 in prejudgment interest on the second verdict.

### E.

### *The Appeal*

Borden filed an appeal and Sons of Thunder filed a cross-appeal. The parties stipulated to narrowing the issues on appeal. Borden agreed to pay the judgment pursuant to the verdict on Question 1 for failing to meet the contractual requirements for the period from April 7, 1986 to August 8, 1987, and to limit its appeal to issues relating to plaintiff's claim that Borden breached the implied covenant of good faith and fair dealing in terminating the contract. Borden specifically withdrew its claims that the trial court erred in striking its fraud defense and in permitting the admission of evidence that Borden had allegedly breached its contract with Sea Work.

Thus, the parties stipulated that the only issue on appeal was whether the trial court properly denied Borden's motion for JNOV on the bad faith claim. The majority of the Appellate Division held that "the right of Borden to terminate the contract on ninety-days notice in accordance with its express terms cannot be over-ridden or eliminated by an implied covenant of good faith and fair dealing." 285 *N.J.Super.* 27, 49, 666 *A.*2d 549 (1995). Despite its holding, the majority explained in detail why Borden's actions did not constitute bad faith.

The dissenting opinion rejected the majority's view of both the law and the facts. Moreover, the dissent asserted that "[i]n every contract there exists an implied covenant that each party will perform its obligations in good faith, will act fairly and will refrain from actions which will destroy the " 'fruits of the contract' " for its contracting partner." *Id.* at 89, 666 *A.*2d 549 (Humphreys, J., dissenting) (citations omitted). After reviewing the facts in detail, the dissent concluded that the jury was correct in finding that

Borden did not perform its obligations in good faith. Thus, the dissent would have affirmed the jury's verdict.

Sons of Thunder appealed as of right under *Rule* 2:2–1(a)(2).

### III

The question whether Borden performed its obligations in good faith appears before the Court as a result of the trial court's denial of Borden's motion for JNOV pursuant to *Rule* 4:40–2(b). In *Dolson v. Anastasia*, 55 *N.J.* 2, 258 *A.2d* 706 (1969), this Court articulated that an appellate court has the same task that a trial court does in reviewing a motion for JNOV:

[T]he test is ... whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor" of the party opposing the motion, *i.e.*, if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.... The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.

[55 *N.J.* 2, 5–6, 258 *A.2d* 706 (1969) (citations and quotations omitted).]

Moreover, that standard ensures that appellate tribunals will not overstep their bounds by usurping the jury's task of assessing the credibility of the witnesses. As this Court stated in *Ferdinand v. Agricultural Insurance Co. of Watertown, N.Y.*, "[w]here men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury." 22 *N.J.* 482, 494, 126 *A.2d* 323 (1956) (citations omitted). We reiterate that standard here because it ensures that the jury's factual determination will be disturbed only if we find that the jury could not have reasonably used the evidence to reach its verdict.

### IV

Although the parties agree that the only issue on appeal is Borden's breach of good faith, they disagree on what conduct is at

issue. Borden focuses only on its termination of the contract whereas Sons of Thunder asserts that Borden's performance over the course of the contract, including its termination, should be considered. The issue is unclear because of the manner in which the special interrogatories were phrased. Neither Question 2 nor 3 was clearly written. For example, because the court determined that the termination clause was ambiguous, interrogatories in addition to Question 2 should have been propounded on that issue. One of the interrogatories should have been: "What does the contract mean?" A subpart to that question should have listed the interpretations that the parties asserted. Finally, the jury verdict form should have asked whether Borden breached the contract as interpreted by the jury. However, Question 3, not Question 2, is the focus of this appeal. Once again, Question 3 reads: "Do you find that defendant, Borden, Inc., breached its obligation of good faith and fair dealing to plaintiff, Sons of Thunder, Inc., in terminating the Contract by its letter of May 8, 1987?" Question 3 suggests that the good faith issue deals only with Borden's termination of the contract. In fact, the majority's opinion was premised on that interpretation. However, after reading the jury instructions as a whole, we have no doubt that the trial court designed Question 3 to deal with Borden's good faith in *performing,* not terminating, the contract and that the jury understood that instruction.

In conducting an extensive hearing on the jury charge, the trial court attempted to satisfy each party's interest. The issue of the role of the implied covenant of good faith and fair dealing caused much debate. Borden's counsel argued that good faith is irrelevant where an express termination clause is found. Sons of Thunder's counsel countered that the implied covenant to perform in good faith is independent of a defendant's motive in terminating a contract. The trial court agreed with plaintiff's counsel:

It seems to me that as a general rule where you have a contract that's terminable by its express terms, a party can terminate, regardless of motive; however, *that's separate from determining whether there has been good faith exercised in the*

*performance of the contract; that you can look at good faith separate and apart from just looking at motive alone and pigeonholing it.*

[ (Emphasis added).]

The issue arose again when the trial court asked the attorneys for their assistance in drafting the jury verdict form. The court wanted to address both the implied obligation of a party to perform its duties in good faith and the irrelevance of motive in determining whether an express termination clause has been violated. Thus, the trial court told the attorneys that it would make clear to the jury that the two questions were distinct and that the jury was to look at the parties' entire performance in determining the former issue. When Sons of Thunder's counsel objected that the proposed interrogatory on the issue of good faith focused on termination, the court explained that "in terminating" differed from "by terminating."

In its instructions to the jury, the trial court attempted to cure any confusion over the jury's interpretation of the contract between Borden and Sons of Thunder. First, the court gave the jury a general instruction on how to construe the terms in that contract. The court explained that the jury's job was "to determine what these two parties intended to accomplish by choosing the language of their contract in its entirety."

Then, the court explained the difference in the relevance of motive in relation, on the one hand, to an express termination clause and, on the other hand, to the implied covenant of good faith and fair dealing in performing a contract.

Finally, Sons of Thunder claims that Borden breached its obligation of good faith by terminating all purchases in May of '87.... In our state, it is the law that where a party to a contract follows an agreement or provision in a contract regarding the termination of that contract, its motives or reasons for terminating the contract are irrelevant.... Now it is also the law in New Jersey that each party to a contract must deal fairly and in good faith with the other *in their performance under the contract....* [I]n addition to the expressed terms of the contract, New Jersey law implies an additional term which obligates both parties to deal with each other in good faith. The obligation of good faith and fair dealing operates exactly as if it had been explicitly written into the parties' agreement or contract. It means that in all of their obligations to one another, under their agreement, they will observe reasonable commercial practices of fair dealing. It

obligates both parties in a contract to take such actions, which in the context of their particular agreements, are necessary to carry out the purposes for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. The purpose of this implied clause of good faith and fair dealing is to protect each party's reasonable expectations that the objects and purposes they sought to achieve by means of their agreement will be achieved. . . . [Y]ou have heard each attorney's arguments regarding this issue, and you will have to decide whether the plaintiff has established a breach of this implied term of the contract between the Sons of Thunder, Inc. and Borden, Inc. based on the evidence that's come before you in this case.

[ (Emphasis added).]

The trial court distinguished between the express termination clause and the implied covenant one last time when it explained how to assess damages: "And finding liability, then you must consider, well, now, let's see what damages the appellant sustained as a result of the breach of contract by a letter of May 8th terminating the contract or by a breach of the implied covenant of good faith."

When reviewing a trial court's instruction to the jury, an appellate court must read the charge as a whole. *See Latta v. Caulfield,* 79 *N.J.* 128, 135, 398 *A.2d* 91 (1979); *Jurman v. Samuel Braen,* 47 *N.J.* 586, 592, 222 *A.2d* 78 (1966). An appellate court should not reverse a trial court when the charge adequately conveys the law and does not confuse or mislead the jury. *See Latta, supra,* 79 *N.J.* at 135, 398 *A.2d* 91; *Jurman, supra,* 47 *N.J.* at 586, 222 *A.2d* 78. More recently, we stated: "Courts uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights." *Fisch v. Bellshot,* 135 *N.J.* 374, 392, 640 *A.2d* 801 (1994).

Similarly, a trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous. *See Vasilevsky v. Chopin,* 244 *N.J.Super.* 703, 709, 583 *A.2d* 414 (App.Div.1990), *certif. denied,* 126 *N.J.* 319, 598 *A.2d* 880 (1991); *Siren v. Behan,* 224 *N.J.Super.* 130, 135, 539 *A.2d* 1244 (App.Div.), *certif. granted* and *summarily remanded for reconsideration on other grounds,* 113 *N.J.* 323, 550 *A.2d* 442 (1988);

*Frank H. Taylor & Son, Inc. v. Shepard,* 136 *N.J.Super.* 85, 92, 344 *A.*2d 344 (App.Div.1975), *aff'd,* 70 *N.J.* 93, 357 *A.*2d 765 (1976). The purposes of submitting interrogatories to the jury "are to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." *Wenner v. McEldowney & Co.,* 102 *N.J.Super.* 13, 19, 245 *A.*2d 208 (App.Div.), *certif. denied,* 52 *N.J.* 493, 246 *A.*2d 452 (1968).

■  We agree with the majority's view that the implied covenant of good faith and fair dealing cannot override an express termination clause. That statement of the law does not, however, provide dispositive guidance in this appeal because we must determine whether Borden *performed* its obligations in good faith. We recognize that framing the issue this way does not seem to follow the wording of Question 3.

However, in its preparation for the charge, the trial court stated on more than one occasion that although a party's motive in terminating a contract is irrelevant as it relates to the alleged violation of the express termination clause, the jury must still decide whether Borden breached the implied obligation of good faith and fair dealing in its performance of the contract. In fact, in response to Sons of Thunder's counsel's objection that Question 3 was too heavily focused on termination, the court explained that it chose the term "in terminating" rather than "by terminating" because "by terminating" would have suggested that motive was relevant where there was an express termination clause.

More importantly, the instructions to the jury included a specific charge on the implied covenant of good faith and fair dealing. Two sentences of that charge clearly articulate that the jury was to consider the implied covenant of good faith separately from the question whether the express termination clause was violated:

Now it is also the law in New Jersey that each party to a contract must deal fairly and in good faith with the other in their performance under the contract.... [I]n addition to the expressed terms of the contract, New Jersey law implies an additional term which obligates both parties to deal with each other in good faith.

After reviewing the pre-charge conference and the instructions themselves, we are satisfied that the jury in answering Questions 2 and 3 understood that Question 2 referred solely to whether Borden breached the termination clause, whereas Question 3 referred solely to whether Borden breached the implied covenant of good faith and fair dealing in performing the contract.

## VI

The majority and dissent also disagreed on whether Borden's performance under the contracts amounted to bad faith. Article 2 of the Uniform Commercial Code (UCC), adopted in New Jersey as *N.J.S.A.* 12A:2–101 to –725, governs the contract between Borden and Sons of Thunder because it is a contract for the sale of goods. Section 1–203 contains the general good faith requirement for every contract governed by the UCC: "Every contract or duty within this Act imposes an obligation of good faith in its *performance* or enforcement." *N.J.S.A.* 12A:1–203 (emphasis added). Good faith is defined as "honesty in fact in the conduct or transaction concerned." *N.J.S.A.* 12A:1–201(19).

In addition, every contract in New Jersey contains an implied covenant of good faith and fair dealing. *See Pickett v. Lloyd's*, 131 *N.J.* 457, 467, 621 *A.*2d 445 (1993); *Onderdonk v. Presbyterian Homes*, 85 *N.J.* 171, 182, 425 *A.*2d 1057 (1981); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 *N.J.* 123, 129–30, 351 *A.*2d 349 (1976); *Association Group Life, Inc. v. Catholic War Veterans*, 61 *N.J.* 150, 152, 293 *A.*2d 382 (1972); *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965). This Court has stated that "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.' " *Palisades Properties, supra,* 44 *N.J.* at 130, 207 *A.*2d 522 (citing 5 *Williston on Contracts* § 670, at 159–60 (3d ed.1961)). Although

the UCC governs this case, the obligation to perform in good faith found in our common law will also influence the result.

■ The obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause. *See United Roasters, Inc. v. Colgate–Palmolive Co.*, 649 *F.*2d 985 (4th Cir.), *cert. denied*, 454 *U.S.* 1054, 102 *S.Ct.* 599, 70 *L. Ed.*2d 590 (1981). In *United Roasters*, United Roasters gave Colgate the right to manufacture and distribute Bambeanos, its roasted soybean snack. The contract governing the relationship allowed Colgate to terminate its performance at any time during the test-marketing period so long as it gave United Roasters thirty days notice. After two years of testing Bambeanos, Colgate announced · plans to merge with Riviana Foods, Inc., and in the next five months, it ceased producing Bambeanos, stopped advertising them, sold its entire inventory of raw soybeans and Bambeanos, and transferred its product manager to another project. *Id.* at 987. Eventually, Colgate terminated the contract. *Id.* at 988.

Interpreting North Carolina law in the diversity action, the Fourth Circuit concluded that North Carolina had not decided whether there was a good faith limitation on an unconditional right to terminate a contract. *Ibid.* The Fourth Circuit did, however, evaluate United Roaster's claim that Colgate violated the covenant of good faith and fair dealing. The panel stated:

> What is wrong with Colgate's conduct in this case is not its failure to communicate a ·decision to terminate ..., but its cessation of performance. Clearly it had an obligation of good faith *performance* up until its right of termination was actually effective. The contract expressly obliged it to use its best efforts in the promotion of Bambeanos. Instead of doing that, it simply ceased *performance....* Quite simply, it broke its contract when it terminated its *performance,* which was United Roasters' contractual due.

> [*Id.* at 990 (emphasis added).]

Thus, the Fourth Circuit affirmed the jury's verdict for United Roasters.

In *Bak–A–Lum Corp., supra*, 69 *N.J.* 123, 351 *A.*2d 349 (1976), this Court reached a similar conclusion even though the contract was oral and the parties had not discussed how the contract could be terminated. In that case, Bak–A–Lum and Alcoa made an oral agreement, which gave Bak–A–Lum an exclusive distributorship of aluminum siding and related products manufactured by Alcoa. *Id.* at 126, 351 *A.*2d 349. Alcoa eventually terminated the exclusive part of the agreement by appointing four additional distributors. Even though Alcoa planned on terminating the distributorship, it encouraged Bak–A–Lum to expand its warehouse facilities, which substantially increased its operating costs. *Id.* at 127, 351 *A.*2d 349.

Despite acknowledging Alcoa's unconditional right to terminate the contract, the Court upheld the verdict for Bak–A–Lum because it found that Alcoa had breached the implied covenant of good faith and fair dealing by withholding its plans to terminate the contract while encouraging the plaintiff to expand its facilities. *Id.* at 129–30, 351 *A.*2d 349. As the Court explained: "While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing persisted between them." *Id.* at 130, 351 *A.*2d 349. The Court found that the implied covenant of good faith and fair dealing required the defendant to give the plaintiff reasonable notice of its termination. *See id.* at 129–30, 351 *A.*2d 349. Ultimately, the Court concluded that "a reasonable period of notice of termination of the distributorship ... would have been twenty months." *Ibid.*

Even though *Bak–A–Lum* involved an oral at-will contract and the contract in *United Roasters* included a clause requiring Colgate to use its best efforts to promote the sale of Bambeanos, we find that those two cases support the proposition that a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate. Other courts have stated that a party can violate the implied covenant of good faith

and fair dealing without violating an express term of a contract. As the Supreme Court of South Dakota noted in *Garrett v. BankWest Inc.*, "[t]he application of this implied covenant allows an aggrieved party to sue for breach of contract. . . . A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." 459 *N.W.2d* 833, 841 (S.D.1990) (citations omitted); *see also Best v. U.S. National Bank*, 303 *Or.* 557, 739 *P.2d* 554, 557 (1987) (stating that plaintiff can recover for breach of implied covenant of good faith and fair dealing even if defendant did not breach express terms of contract).

Legal scholars have also commented on the independence of the implied duty to act in good faith and the express terms of the contract. *See* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 *Harv. L.Rev.* 369, 371 (1980) ("[E]xpress contract terms alone are insufficient to determine a party's good faith in performance."); Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 *Va. L.Rev.* 195, 233 (1968) ("[I]n addition to the more familiar sources of standards of performance—for example, the contract language itself, case law on how contract gaps are to be filled, and custom and usage— judges turn to specific concepts of good faith in deciding whether a party has or has not performed his agreement.").

The case most heavily relied on by Borden and the majority at the Appellate Division, *Karl's Sales & Service, Inc. v. Gimbel Brothers Inc.*, 249 *N.J.Super.* 487, 592 *A.2d* 647 (App.Div.), *certif. denied*, 127 *N.J.* 548, 606 *A.2d* 362 (1991), is distinguishable from this matter. In that case, the Appellate Division stated that where the contractual right to terminate is express and unambiguous, the motive of the terminating party is irrelevant. *Id.* at 495, 592 *A.2d* 647. As stated previously, we agree with that view of the law. *Supra* at 417, 690 *A.2d* at 585. However, in *Karl's Sales*, unlike this case and *Bak–A–Lum*, there were no allegations of bad faith or dishonesty on the part of the terminating party. Accord-

ingly, *Karl's Sales* did not address the issue we are concerned with here.

In viewing the evidence in a light most favorable to Sons of Thunder, we find that the trial court correctly determined that the jury could have reasonably found that Borden breached its obligation to perform its duties in good faith. Even though DeMusz is not the plaintiff, his dealings with Borden are critical to the outcome of this appeal because he was the point man for Sons of Thunder and because the different corporations were so intertwined. When all those relationships are viewed together, there is sufficient evidence for the jury's conclusion that Borden breached its duty to perform the contract in good faith. In reaching that conclusion, we consider only Borden's performance during the contractual period, including the conduct surrounding the termination of the contract. We do not consider Borden's dealings following the termination of the contract because they are irrelevant to whether Borden performed the contract in good faith.

Borden knew that Sons of Thunder depended on the income from its contract with Borden to pay back the loan. Yet, Borden continuously breached that contract by never buying the required amount of clams from the *Sons of Thunder*. Furthermore, after Gallant took Booker's place, he told DeMusz that he would not honor the contract with Sons of Thunder. Nicholson also told DeMusz that he did not plan to honor that contract. Borden's failure to honor the contract left Sons of Thunder with insufficient revenue to support its financing for the *Sons of Thunder*.

Borden was also aware that Sons of Thunder was guaranteeing every loan that Sea Work had taken to finance the rerigging and purchasing costs for the *Jessica Lori*. Thus, Borden knew that the corporations were dependent on each other, and that if one company failed, the other would most likely fail. Borden, however, fulfilled its obligations to Sea Work only for a short time. Eventually, Borden terminated its contract with Sea Work even

though it knew that terminating the contract would leave Sea Work with no market to fish the *Jessica Lori.*

After Nicholson arrived, purchases from the *Sons of Thunder* and the *Jessica Lori* decreased. Moreover, Borden charged Sea Work fees for the salt and carbon dioxide that the *Jessica Lori* used to Shuck-at-Sea. Eventually, Borden stopped purchasing clams from the *Jessica Lori.* When the *Jessica Lori* tried to sell to other suppliers, Borden charged it a rental fee for using the shucking equipment. Indeed, at the end of the relationship, Borden sent the *Sons of Thunder* out only in bad weather.

Despite knowing the desperate financial straits of the three corporations, Gallant, on behalf of Borden, still pressured DeMusz to obtain outside financing to pay back the $125,000 advance.

Accepting those facts and the reasonable inferences therefrom offered as true, we determine that the jury had sufficient evidence to find that Borden was not "honest in fact," as required by the UCC. Because its conduct destroyed Sons of Thunder's reasonable expectations and right to receive the fruits of the contract, Borden also breached the implied covenant of good faith found in New Jersey's common law.

## VII

The final issue is whether the jury's assessment of $412,-000, approximately one year's worth of additional profits, for the breach of the implied covenant of good faith and fair dealing was a reasonable verdict. Specifically, can a plaintiff recover lost profits for a breach of the implied covenant of good faith and fair dealing? We agree with Judge Humphreys that the jury's award of one year's additional profits "is a reasonable and fair estimate of 'expectation damages.'" 285 *N.J.Super.* at 104, 666 *A.*2d 549. Moreover, we agree with the trial court that lost profits are an appropriate remedy when a buyer breaches the implied covenant of good faith and fair dealing.

In general, the UCC's remedies are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." *N.J.S.A.* 12A:1–106. Specifically, Section 2–708(2) of the UCC provides:

> If the measure of damages in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Chapter (12A:2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.
>
> [*N.J.S.A.* 12A:2–708(2).]

Subsection (1) permits the seller to recover the difference between the market price at the time and place of tender and the unpaid contract price. *Ibid.* Because subsection (1) only applies to sellers who could have tendered the goods, courts grant lost profits under subsection (2) to sellers who have nothing to resell. *See* Roy Ryden Anderson, *A Roadmap for Sellers' Damage Remedies Under the Uniform Commercial Code and Some Thoughts About Pleading and Proving Special Damages,* 19 *Rutgers L.J.* 245, 262–63 (1988). Sellers with nothing to resell recover lost profits when buyers breach the contract because "in [such] circumstances the seller's actions for the price or resale are inapplicable.... Thus the only recovery which grossly approximates the [ ] economic losses is a recovery based on profits." James J. White & Robert S. Summers, *Uniform Commercial Code* § 7–10, at 388–89 (4th ed.1995); *see also Kvassay v. Murray,* 15 *Kan.App.*2d 426, 808 *P.*2d 896, 902 (1991) (reversing trial court's conclusion that lost profits could not be recovered for goods that had not been produced).

In *Apex Metal Stamping Co., Inc., v. Alexander & Sawyer, Inc.,* the Appellate Division addressed lost profits before the passage of the UCC:

> The fundamental concept concerning the measure of damages ... where the plaintiff is a supplier, producer or contractor who has been prevented by the defendant from completing his contract, is that the plaintiff is entitled to the profit that would have been realized if performance had been completed. This is generally measured by the difference between the contract price and the cost of performance or production.

[48 *N.J.Super.* 476, 484, 138 *A.*2d 568 (App.Div.1958) (citations omitted).]

Under our common law principles, "a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." *Pickett v. Lloyd's*, 131 *N.J.* 457, 474, 621 *A.*2d 445 (1993). Moreover, this Court has awarded lost profits to a plaintiff where the defendant breached the implied covenant of good faith and fair dealing. *Bak–A–Lum, supra,* 69 *N.J.* at 130–31, 351 *A.*2d 349.

■ "In order to recover for lost profits under [section 2–708(2)], the plaintiffs must prove the amount of damages with a reasonable degree of certainty, that the wrongful acts of the defendant caused the loss of profit, and that the profits were reasonably within the contemplation of the parties at the time the contract was entered into." *Unique Systems, Inc. v. Zotos Int'l, Inc.*, 622 *F.*2d 373, 378, 379 (8th Cir.1980) (affirming trial court's finding that plaintiff proved its lost profits to reasonable degree of certainty); *see also In re Merritt Logan, Inc.*, 901 *F.*2d 349, 359 (3d Cir.1990) (finding plaintiff's testimony, expert's testimony, *pro forma* operating statement, and defendant's statement concerning that *pro forma* showed to reasonable certainty that plaintiff would have earned profits).

The jury's award of $412,000, approximately one year's profit, for the breach of the implied covenant of good faith and fair dealing is reasonable and fair given the circumstances, particularly Greenberg's testimony. Greenberg estimated that Sons of Thunder's yearly profits would have been between $390,513 and $430,-516 per year if the contract had run for the five-year term. Those estimates were made with a reasonable degree of certainty, and therefore Sons of Thunder met its burden of proving its damages.

## VIII

The trial court properly denied Borden's motion for JNOV. Accordingly, the judgment of the Appellate Division is reversed, and the judgment of the trial court is reinstated.

428

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.