OPINION GRANTING DEPENDANTS SONIC FINANCIAL CORP. AND SPEEDWAY MOTORSPORTS, INC.’S MOTIONS FOR SUMMARY JUDGMENT
 

 BROTMAN, District Judge.
 

 Presently before the Court are motions by defendants Sonic Financial Corp. (“Sonic”) and Speedway Motorsports, Inc. (“Speedway”) for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, these motions will be granted.
 

 I.
 
 FACTS AND PROCEDURAL BACKGROUND
 

 This breach of contract action arises out of the termination of an agreement to purchase the Atlantic City Race Course. On November 13, 1997, Atlantic City Racing Association (“ACRA”) and Sonic, both of which were represented by counsel, entered into a Purchase and Sale Agreement, wherein ACRA agreed to sell to Sonic the Atlantic City Race Course and related real estate in Hamilton Township, New Jersey (“the property”) for $11 million. Defendant Speedway was not a signatory to the Purchase and Sale Agreement between ACRA and Sonic. The Agreement provided, however, that at closing and as part of the purchase price for the property, Sonic would deliver to ACRA a warrant to purchase 325,000 shares of Speedway’s common stock.
 
 See
 
 Defs.’ Ex. A at 4.
 

 Under the Agreement, closing was contingent upon the performance, by the closing date, of specified ACRA obligations and conditions precedent to Sonic’s duty to purchase. Relevant provisions of the Agreement respecting these obligations and conditions precedent are set forth below:
 

 5. Obligations of Seller at Closing. At the closing, Seller shall deliver to Buyer the following (collectively referred to hereinafter as the “Closing Documents.”):
 

 a. A Bargain and Sale Deed with Covenants Against Grantor’s Acts substantially in the form of
 
 Exhibit 5. a.
 
 attached to this Agreement or in other form acceptable to Buyer’s counsel, duly executed by Seller and properly acknowledged, transferring good, marketable and insurable title to all of the Property, including the Leased Premises, to Buyer, provided, however, that such conveyance shall not abrogate Buyer’s obligation to lease the Leased Premises to Seller as otherwise provided herein;.
 

 b. An affidavit of title substantially in the form of
 
 Exhibit 5.b.
 
 attached to this Agreement, duly executed by Seller and acknowledged;
 

 7. Conditions Precedent to Obligations of Buyer. The obligations of Buyer under this Agreement shall be subject to the satisfaction, before the Closing Date, of all of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:
 

 d. Seller shall have delivered at Closing all of the Closing Documents, in form and substance satisfactory to Buyer, executed by Seller, conveying to Buyer the Property.
 

 
 *500
 
 f. Seller shall have good, marketable and insurable title to the Property subject only to the Permitted Exceptions, which shall be conveyed to Buyer at closing.
 

 h. Seller shall have delivered or caused to be delivered such corporate resolutions, shareholder and director approvals ... as are reasonably required by the Buyer or the title company insuring the Buyer’s title to the Property.
 

 i. Buyer shall be satisfied, in its sole discretion, with the results of any environmental or other testing or inspections undertaken pursuant to paragraphs 10 and 13 of this Agreement or otherwise and the results of the Survey undertaken pursuant to Paragraph 11 of this Agreement.
 

 Id.
 

 Closing originally was scheduled to occur on or about January 13, 1998, with Sonic having until January 12, 1998 to complete its due diligence. Included in this due diligence was Sonic’s right to perform various inspections of the property. During such inspection period, Sonic could terminate the agreement, in its sole discretion, pursuant to the express terms of paragraph 13, which provided in pertinent part:
 

 a. Buyer and its agents and contractors shall be entitled to enter upon the Property during the period from and after the complete execution of this Agreement by all parties through and including the day before the Closing Date (the “Inspection Period”) to obtain financing, to inspect the Property, to perform investigations (including without limitation environmental investigations), to determine the status of utilities thereon, to conduct title examinations, zoning investigations, feasibility studies geological tests and other studies or tests necessary to determine whether the Property is suitable for Buyer’s intended use of the Property, including but not limited to soil, surface water and groundwater sampling, drilling and test wells and borings. If, during the Inspection Period, Buyer determines, in Buyer’s sole discretion, not to close the purchase of the Property, Buyer may terminate this Agreement, Escrow Agent shall return the full amount of the Earnest Money to Buyer and Buyer and Seller shall be relieved of all obligations hereunder.
 

 Defs.’ Ex. A at 12.
 

 By letter dated January 9, 1998, Sonic provided ACRA with notice of termination.
 
 See
 
 Defs.’ Ex. B. On January 12, 1998, ACRA and Sonic executed an amendment to the agreement (“the First Amendment”), extending the inspection period through February 11, 1998 and rescheduling the closing date for February 12, 1998.
 
 See
 
 Defs.’ Ex. C. The First Amendment provided that “All other terms, conditions and provisions set forth in the Agreement shall remain in full force and effect, as amended hereby.”
 
 Id.
 

 On February 9, 1998, Sonic again gave notice of termination,
 
 see
 
 Defs.’ Ex. D, and three days later, the parties entered into a Second Amendment which extended the Inspection Period through February 17, 1998.
 
 See
 
 Defs.’ Ex. E. Under the Second Amendment, the closing date was moved to February 19, 1998, and the purchase price was reduced from $11 million to $9 million:
 

 Seller and Buyer have now agreed to further extend the Inspection Period until February 17, 1998 for purposes of completing a survey and title examination of the Property, to further extend the Closing and the Closing Date until February 19,1998 and to reduce a certain portion of the Purchase Price, and Seller and Buyer wish to further amend the Agreement to reflect such agreements.
 

 Id.
 

 As to the continuation of due diligence, the Second Amendment provided in relevant part:
 

 
 *501
 
 NOW, THEREFORE, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:
 

 2.
 
 Inspection Period.
 
 The definition of the term “Inspection Period” contained in Paragraph 13a of the Agreement is hereby amended by deleting the words “the period from and after the complete execution of this Agreement by all parties through and including the day before the Closing Date” and by inserting the following words in lieu thereof and in lieu of the revised definition of the term “Inspection Period” contained in Paragraph 2 of the First Amendment:
 

 the period from and after the complete execution of this Agreement by all parties through and including February 17, 1998 or on the day which is two (2) days before such date as may reasonably be required by Buyer and agreed upon by Buyer and Seller for the Closing Date subsequent to February 19,1998.
 

 Provided, however, that the extension of the Inspection Period contemplated by this Second Amendment is for the sole purpose of permitting Buyer to complete its survey and title examination of the Property, Buyer hereby acknowledging that it has completed its physical inspection of the Property and all environmental testing and other inspections of the Property to its satisfaction.
 

 Id.
 
 The Second Amendment further provided that “All other terms, conditions and provisions set forth in the Agreement and the First Amendment shall remain in full force and effect, as amended hereby.”
 
 Id.
 

 By letter dated February 17, Sonic provided a final notice of termination, stating that it would not be closing the purchase of the property. Sonic stated as reasons for the termination that “certain outstanding title issues remain[ed] unresolved to Sonic’s satisfaction” and AGRA had not obtained necessary approval of the sale by its stockholders, conditions precedent for closing which Sonic would not waive. Defs.’ Ex. F. ACRA concedes that the agreement, as modified by the Second Amendment, was not approved by its shareholders before the February 19, 1998 closing date.
 
 See
 
 Am. Comp. ¶ 15.
 

 On March 13,1998 ACRA filed the present action against Sonic and Speedway, asserting claims for breach of contract, fraud, and bad faith, for which it requests specific performance of the agreement or, in the alternative, compensatory damages. On June 7, 1999 Sonic and Speedway filed the instant summary judgment motion, seeking dismissal of all claims.
 
 [1]
 

 II.
 
 DISCUSSION
 

 A. Jurisdiction
 

 As the plaintiff and defendants are citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75, 000), this Court has jurisdiction over the present matter pursuant to 42 U.S.C. § 1332.
 

 B. Summary Judgment Standard
 

 The standard for granting a motion for summary judgment is a stringent one, but it is not insurmountable. Fed.R.Civ.P. 56 provides that summary judgment may be
 
 *502
 
 granted. only when materials of record “show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.”
 
 Serbin v. Bora Corp.,
 
 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are “any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 

 Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion “provides evidence ‘such that a reasonable jury could return a verdict for the nonmoving party.’ ”
 
 Lawrence v. National Westminster Bank New Jersey,
 
 98 F.3d 61, 65 (3d Cir.1996) (quoting
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, “its opponent must do more than simply show that there is some metaphysical doubt as to material facts.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must “make a showing sufficient to establish the existence of [every] element essential to that party’s case, and on which that party will bear the burden of proof at trial.”
 
 Serbin,
 
 96 F.3d at 69 n. 2 (quoting
 
 Celotex Corp. v. Catrett, 477
 
 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986));
 
 see also Quiroga v. Hasbro, Inc.,
 
 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not “rest upon mere allegations, general denials, or ... vague statements”). Thus, if the nonmovant’s evidence is merely “colorable” or is “not significantly probative,” the court may grant summary judgment.
 
 Anderson, 477
 
 U.S. at 249-50, 106 S.Ct. at 2511.
 

 C. Applicable Law
 

 The purchase and sale agreement between ACRA and Sonic expressly provided that matters pertaining to it shall be governed by the law of New Jersey,
 
 see
 
 Defs.’ Ex. A ¶ 22 at 18, which neither party contests. The Court therefore will assess plaintiffs breach of contract claims according to New Jersey law.
 
 See e.g., Caspi v. Microsoft Network, LLC,
 
 323 N.J.Super. 118, 732 A.2d 528 (App.Div.1999).
 

 D. Count One — Fraud
 

 Sonic and Speedway seek dismissal of ACRA’s fraud claim, arguing that it was not pled with sufficient particularity as required by Fed.R.Civ.P. 9(b).
 
 [2]
 
 To support this argument, defendants cite to
 
 Saporito v. Combustion Engineering, Inc.,
 
 1988 WL 142406 (D.N.J.1988).
 
 [3]
 
 This unreported opinion, however, is distinguishable from the present case.
 

 In
 
 Saporito,
 
 the district court granted defendant’s motion to dismiss a RICO claim, where plaintiffs had been granted an opportunity to amend their complaint to satisfy the specificity requirement of 9(b) and the amended complaint still failed to provide the requisite specificity.
 
 Id.
 
 at *4. Plaintiffs in
 
 Saporito
 
 filed a civil RICO claim against defendant, their employer, alleging that they were fraudulently induced into early retirement pursuant to a Voluntary Early Separation Plan (“VESP”) while certain “favored” employees secretly were informed of. a separate
 
 *503
 
 and more favorable retirement plan (“VSIP”). Originally, the district court, pursuant to Fed. R. Civ. P. 12(b), dismissed the RICO claim. The Court of Appeals for the Third Circuit reversed, finding that plaintiffs had failed to plead the claim with sufficient particularity.
 
 [4]
 
 The Third Circuit therefore remanded the count with instructions to grant plaintiff leave to amend the complaint. The amended complaint repeated , that which was stated in the original complaint, but then named some of the “favored” employees alleged to have received the confidential information regarding the VSIP.
 
 [5]
 
 Finding that the complaint as amended remained deficient, the district court reasoned:
 

 [T]he amended complaint virtually mimics paragraph 25 of the original complaint, with the exception that plaintiffs now identify certain employees who, plaintiffs ‘upon information and belief allege, selectively received information about VSIP prior to its institution. Plaintiffs still fail to identify [as directed by the Third Circuit on remand] the parties who passed on this information to those ‘favored’ employees or the manner in which this privileged information was transmitted (i.e., mail or wire).
 

 Id.
 
 at *4. Accordingly, the court granted defendant’s motion to dismiss the RICO count for want of specificity.
 

 The Court acknowledges that under
 
 Sa-porito,
 
 count I of ACRA’s complaint technically fails to provide the necessary particularity under Fed.R.Civ.P. 9(b), namely, who made the representations complained of and how ACRA was harmed therefrom. However, there is no indication that defendants have been prejudiced by this deficiency. The Third Circuit has noted that “in applying [9(b) ], focusing exclusively on its ‘particularity’ language ‘is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.’ ”
 
 Christidis v. First Pennsylvania Mortgage Trust,
 
 717 F.2d 96, 100 (3d Cir.1983). Moreover, the purpose of 9(b) is to “place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.”
 
 Semite Indus. Mach. Corp. v. Southmost Mach. Corp.,
 
 742 F.2d 786, 791 (3d Cir.1984).
 

 In the instance case, ACRA filed its complaint containing the fraud count on March 13, 1998. Defendants, however, did not file the present motion for summary judgment, raising the specificity issue for the first time, until June 6, 1999, more than one year after the filing of the complaint. In light of this gap in time, and the fact that discovery is now complete, the Court finds no practical reasons for dismissing the fraud count under 9(b). The pleading deficiencies in no way precluded defendants from responding to the allegations in its answer. In addition, in its supporting brief to the instant motion, Sonic provides detailed analysis as to why ACRA’s fraud claim should be dismissed on the merits. Thus, Sonic clearly had sufficient notice of the basis of ACRA’s fraud claim with which to present a meaningful defense.
 
 See United States v. Sonstein,
 
 27 F.R.D. 284, 285 (E.D.Pa.1961)
 
 *504
 
 (denying motion to dismiss fraud claim where defendant could “prepare an adequate answer from the allegations in the amended complaint” and could “prepare his own discovery and thus prepare an adequate defense to [the] suit”). The Court therefore declines to dismiss ACRA’s fraud claim on the grounds that it was pled with insufficient particularity.
 

 Anticipating the above conclusion, defendants also argue that ACRA cannot make out a claim of fraud on the merits.
 
 See
 
 Sonic’s Supp. Br. at 14. In New Jersey, the elements for common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by that person; and (5) resulting damages.
 
 See Alexander v. CIGNA Corp.,
 
 991 F.Supp. 427, 435 (D.N.J.1998). Allegations of fraud must be proved by clear and convincing evidence. Thus, to defeat a motion for summary judgment, a plaintiff carries the burden of presenting evidence which could permit a reasonable jury to find by clear and convincing evidence the existence of fraud.
 
 Id.
 
 A review of ACRA’s brief in opposition reveals that it cannot sustain this burden. Thus, for the reasons set forth below, summary judgment will be granted in favor of defendants as to count I of plaintiff s complaint.
 

 1. ACRA proffers no evidence concerning defendants’ alleged misrepresentation
 

 In its complaint, ACRA alleges that Sonic and Speedway, through their agents, misrepresented that title to the property would be closed “in accordance with the terms and conditions of the Agreement when they knew, and it was their intention, to close only if they received certain concessions and/or assurances ... from the State of New Jersey.” Am. Comp. ¶ 24. No where in its opposition brief, however, does plaintiff state who made such misrepresentations or to whom they were made. ACRA instead states:
 

 While plaintiff does not believe that the [fraud] allegations [in its complaint] are too general, plaintiff would be very willing to amend said pleadings to state the identity, time, place, and content of the misrepresentations made. However, plaintiff believes that defendants entered into the agreements in issue with no intent to abide by their obligations unless financial concessions from the State of New Jersey were obtained.
 

 ACRA’s Opp’n. Br. at 41. As discussed above, the Court is willing to overlook, for dismissal purposes pursuant to Fed. R.Civ.P. 9(b), ACRA’s failure to properly plead its fraud claim with sufficient particularity. To defeat a motion for summary judgment based on the merits, however, ACRA cannot sit back and rely on its “belief’ or (nonspecific) allegations set forth in its complaint. To the contrary, in order to defeat summary judgment, ACRA bears a
 
 present
 
 burden of demonstrating the existence of a genuine issue as to a material fact. Such burden at minimum involves presenting some evidence supporting its allegation that defendants made material misrepresentations, i.e., the “time, place, and content” of such misrepresentations. ACRA’s offer to provide such information if afforded leave to amend the complaint while, at the same time, failing to supply such facts in its brief opposing defendants’ motions for summary judgment appears disingenuous.
 

 ACRA has proffered no evidence from which a reasonable jury could find that either Sonic or Speedway made material misrepresentations to ACRA. The only support ACRA offers to defend its fraud claim are two newspaper articles dated January 18, 1998 and March 17, 1998, which report that representatives of defendants were waiting for concessions from the State of New Jersey before closing the purchase of the property.
 
 See
 
 PL’s Ex. E. Sonic appropriately objects to consideration of these articles on hearsay grounds.
 
 *505
 
 Even assuming that ACRA could properly admit this evidence at trial, it fails to be probative of whether defendants, through their agents, made misrepresentations to ACRA. Thus, ACRA has failed to proffer any evidence creating a genuine issue as to defendants’ alleged material misrepresentations, an element for which ACRA would bear the burden of proof at trial. On this deficiency alone, defendants are entitled to summary judgment on the fraud claim.
 
 [6]
 

 See Bombard v. Fort Wayne Newspapers, Inc.,
 
 92 F.3d 560, 562 (7th Cir.1996) (stating that the court “reifies] on the nonmoving party to identity with reasonable particularity the evidence” upon which the claim is based and “fi]f the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party”).
 

 2. ACRA did not reasonably rely on alleged misrepresentation
 

 Also fatal to ACRA’s fraud claim is the fact that Robert Levy, its CEO, admitted that he had read the January 18, 1998 article before the Second Amendment to the sale agreement was executed. Levy’s deposition testimony provides in pertinent part:
 

 Q. Now, in paragraph 22 [of the complaint] you allege that, “At the time the defendants entered into the agreement defendants knew they would only close title and provide the warrant if they received assurances and/or agreements and/or concessions from the State of New Jersey.” What is your basis for saying that?
 

 A. Our basis for that is media releases to that effect where they told the newspapers that, they stated that, quoted saying that, plus conversation with officials in New Jersey that said that they told the Jersey officials that it was the only way they can close with us is to have, is to have these concessions made.
 

 Q. And with respect to the media statements, tell me about that.
 

 A. I think it’s articles that Mr. Murphy showed you.
 

 ;¡: * *
 
 t'fi
 
 * }]:
 

 Q. I show you three documents that have been identified by Mr. Murphy, P-1, P-2 and P-3, and ask you if those are the document you’re referring to.
 

 A. These are some of them.
 

 Q. And the one you’re looking at right there I believe is in January of 1998.
 

 A. January 18.
 

 Q. Had you read that story at the time?
 

 A. Yeah. I read the story. This is right before he met with the governor.
 

 Q. When I say you read the story, you read the story at the time it came out?
 

 A. Yes.
 

 Pl.’s Ex. E at 26-28.
 

 The above testimony reveals that ACRA had knowledge of Sonic’s interest in obtaining a memorandum of understanding with the State of New Jersey before finalizing the sale. Thus, assuming, arguendo, that Sonic did materially misrepresent a lack of this interest to ACRA, ACRA nonetheless cannot demonstrate by clear and convincing evidence that it reasonably relied on this misrepresentation. As a result, ACRA cannot make out a claim for
 
 *506
 
 fraud.
 
 [7]
 
 Accordingly, the Court will grant summary judgment to Sonic and Speedway as to count I of the amended complaint.
 

 E. Counts Two and Three — Breach of Contract
 

 In its amended complaint, ACRA asserts breach of contract claims against Sonic and Speedway, requesting either specific performance of the agreement (count two) or compensatory damages (count three).
 

 1. Defendant Sonic
 

 Sonic argues that under the clear terms of the agreement, it had sole discretion as to whether to close the purchase or to terminate the sale agreement. Disagreeing, ACRA claims that the second amendment to the sale agreement served to
 
 inter alia
 
 modify Sonic’s otherwise sole discretion. Specifically, ACRA argues that under the second amendment, Sonic could only terminate the agreement by exercising reasonable discretion respecting title and survey concerns.
 

 The interpretation of a contract is a matter of law for the court.
 
 See e.g., Fastenberg v. Prudential Insurance Co. of America,
 
 309 N.J.Super. 415, 707 A.2d 209, 211 (App.Div.1998). “The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them.”
 
 Karl’s Sales and Service, Inc. v. Gimbel Bros., Inc.,
 
 592 A.2d 647, 650 (App.Div.1991). Where the terms of the contract are clear, “the court must enforce those terms as written.” Thus, the court cannot undertake to rewrite a contract “merely because one might conclude that it [would] have been functionally desirable to draft it differently.”
 
 Id.
 
 (quotation omitted). Where ambiguities appear in the contract, they are to be strictly construed against the drafter.
 
 Id.
 
 With these principles in mind, the Court finds that the agreement clearly and unambiguously sets forth the terms for cancellation of the contract.
 

 Paragraph 13a. of the agreement clearly sets forth the right of Sonic to perform various inspections of the property “necessary to determine whether the Property is suitable for Buyer’s intended use of the Property.” Sonic’s Supp. Br., Ex. A. at 12. Moreover, the contract expressly provides-that “If, during the Inspection Period, Buyer determines, in Buyer’s sole discretion, not to close the purchase of the Property, Buyer may terminate this Agreement.”
 
 Id.
 
 Both ACRA and Sonic agree that under this provision of the contract, Sonic obtained the absolute right to terminate the contract. What the parties dispute, however, is the effect, if any, of the Second Amendment on this right of termination.
 

 The Second Amendment to the contract extended the inspection period until February 17,1998, but with the following qualification:
 

 Provided, however, that the extension of the Inspection Period contemplated by this Second Amendment is for the sole purpose of permitting Buyer to complete its survey and title examination of the Property, Buyer hereby acknowledging that it has completed its physical inspection of the Property and all environmental testing and other inspections of the Property to its satisfaction.
 

 The Court agrees with plaintiff that the phrase,
 
 “for the sole purpose
 
 of permitting Buyer to complete its survey and title examination of the Property” limited Sonic’s right to continued inspection to title and survey matters. Moreover, the paragraph’s remaining terms, “Buyer hereby acknowledging that it has completed its physical inspection of the Property and all environmental testing and other inspections of the Property to its satisfaction” clearly establishes that Sonic had completed inspection
 
 to its satisfaction
 
 as to these subjects. Thus, the express terms of the Second Amendment unambiguously restricted Sonic’s right to terminate the
 
 *507
 
 agreement under ¶ 13a to only matters respecting title and survey.
 

 While the Second Amendment confined inspection to title and survey, Sonic still retained the right to terminate the agreement in its sole discretion as to title and survey concerns. Contesting this, ACRA asserts that II7, pertaining to conditions precedent to Sonic’s obligations, only required that Sonic be reasonably satisfied and contained “no sole discretion language relative to survey or title concerns.” ACRA’s Opp’n. Br. at 29-30. ACRA is mistaken. Subsection i. to 117 specifically provides that, “Buyer shall be satisfied, in
 
 its sote discretion,
 
 with the results of any ... testing or inspections undertaken pursuant to Paragraphs 10 and 13 of this Agreement or otherwise and the results of the Survey undertaken pursuant to Paragraph 11 of this Agreement.” Defs.’ Ex. A at 9 (emphasis added). Thus, the original agreement clearly afforded Sonic with sole discretion in assessing the inspections and survey results.
 

 While the Second Amendment restricts inspection to title and survey matters, no where does it expressly eliminate Sonic’s right to exercise sole discretion as to these concerns. Nor can the language of the Second Amendment reasonably be construed to implicitly suspend such discretion. Moreover, 116 of the Second Amendment unambiguously states that “All other terms, conditions and provisions set forth in the Agreement and the First Amendment shall remain in full force and effect, as amended hereby.” Defs.’ Ex. E. Thus, the Court finds that under the clear terms of the original agreement and all amendments thereto, Sonic retained the right to terminate the sale agreement, in its sole discretion, based on title and/or survey concerns.
 

 By letter dated February 17, 1998, Sonic informed ACRA that it was terminating the agreement, stating as reasons that “Certain outstanding title issues remain unresolved to Sonic’s satisfaction.” Defs.’ Ex. F. In its supporting brief, Sonic lists several issues as valid title and survey concerns for terminating the agreement. Not surprisingly, plaintiff disagrees, arguing that the reasons stated did not pertain to title and survey. The Court agrees that several of the matters detailed by Sonic did not relate to title or survey.
 
 [8]
 
 None
 
 *508
 
 theless, the Court finds that the following items did constitute valid title and/or survey concerns.
 

 a. Tower Lease
 

 Sonic argues that a Tower Site Lease Agreement (“Tower Lease”) entered into between ACRA and Ellis Thompson Corporation (“Ellis”) created an encumbrance against the property and interfered with Sonic’s intended use thereof. The Court agrees that the existence of the lease created a concern respecting title.
 

 Under the Tower Lease, Ellis obtained the right to lease a portion of the property for a five year period beginning May 1, 1991 and the option to renew the lease for one additional five year term. Moreover, renewal of the lease would take place auto- ' matically, unless Ellis notified ACRA within a certain period of its intent not to renew, which Ellis did not do. Thus, upon expiration of the lease on April 30, 1996, the lease was automatically renewed for another five year term, which term does not expire until April 30, 2001. While the lease agreement does provide for termination of the lease by either party before the end of the five-year term, such termination requires two years prior notice. Thus, even if ACRA had given Ellis notice of termination, which it did not, Sonic’s title to the property would have been subject to the Tower lease for two years.
 

 Pursuant to paragraph 5b of the sale agreement, ACRA had the obligation to deliver to Sonic “An affidavit of title substantially in the form of
 
 Exhibit 5.b
 
 attached to this Agreement, duly executed by Seller and acknowledged.” Under paragraph 5 of Exhibit 5.b, the Seller warrants that “There are no tenants or other occupants of this property. [Seller] has not given anyone else any rights concerning the purchase or lease of this proper
 
 *509
 
 ty.”
 
 [9]
 
 In light of the Tower Lease, ACRA clearly could not have certified to the truth of paragraph 5 in the affidavit of title. Thus, the Court concludes as a matter of law that the Tower Lease created a legitimate concern respecting title to the property, which concern authorized Sonic to terminate the agreement.
 

 b. Lack of Shareholder Approval
 

 ACRA does not dispute that the issue of shareholder approval qualifies as a title matter. Moreover, ACRA concedes that “At the time the second amendment was entered into, there was not sufficient time between the signing of the second amendment and closing to hold a stockholder’s meeting of plaintiff for approval of this transaction as amended.” Am. Comp, at 1115. ACRA argues, however, that shareholder approval by the closing date ceased to raise a genuine title concern, because a valid alternate procedure for obtaining shareholder approval was in place. Under this procedure, ACRA’s principal stockholders would consent in writing to the purchase and further agree to vote in favor of the transaction at the shareholder’s meeting, which would take place sometime after the closing.
 

 The Court agrees with Sonic that the alternative method proposed by AGRA for obtaining shareholder consent was subject to Sonic’s approval, which approval it did not extend. Paragraph 26 of the agreement clearly stated in pertinent part:
 

 This agreement ... constitutes the entire agreement between ... Seller and Buyer. No breach of any covenant, agreement, warranty or representation contained herein shall be deemed waived unless expressly waived in writing by the party who might assert such breach....
 

 This agreement may not be modified by either party unless done so in writing and signed by both parties.
 

 Defs.’ Ex. A at 19-20. Acquisition of shareholder approval by the closing date was a condition precedent under paragraph 7h. of the agreement.
 
 Id.
 
 at 8. ACRA proffers no evidence indicating that Sonic either waived or agreed to modify this condition.
 

 The Court therefore concludes that the issues concerning the Tower Lease and shareholder approval authorized Sonic, pursuant to the termination provision as modified in the Second Amendment, to decline to close title to the Property. Thus, the Court concludes as a matter of law that Sonic did not breach the express terms of the contract.
 

 2. Defendant Speed,way
 

 Under the agreement, the closing of the property was a condition precedent to Speedway’s obligation to deliver the warrant. As closing was never executed, defendant Speedway’s obligation to deliver a Warrant to ACRA failed to materialize. Thus, summary judgment as to counts two and three will be entered in favor of Speedway.
 

 F. Count Four — Bad Faith
 

 In count four of the amended complaint, ACRA asserts that defendants “acted in bad faith in failing to close title and in attempting to allege conditions that they knew did not exist in an attempt to terminate the Agreement.” In its opposition brief, however, AGRA fails to set forth any arguments or facts in defense of its bad faith claim. Based on this deficiency alone, the Court is authorized to dismiss ACRA’s bad faith claim.
 
 See Hoffman v. Bankers Trust Co.,
 
 925 F.Supp. 315, 318 (M.D.Pa.1995);
 
 National Comm. Ass’n., Inc. v. American Tel. & Tel. Co.,
 
 1998 WL
 
 *510
 
 118174 at *28 (S.D.N.Y. March 16, 1998). Nonetheless, after reviewing the parties’ briefs in their entirety, the Court is confident that the factual predicate for ACRA’s bad faith claim stems from the same allegations of fact set forth to support its fraud claim. As ACRA did devote a section of its brief in addressing the fraud claim, the Court will treat such discussion as also defending its bad faith claim, and accordingly, will consider the merits of the bad faith claim for summary judgment purposes.
 

 1. Defendant Sonic
 

 ACRA appears to allege that Sonic acted in bad faith by terminating the agreement, not based on the title issues discussed above, but because it failed to obtain desired concessions from the State of New Jersey. New Jersey law is clear, however, that “Where the contractual right to terminate is express and unambiguous, the motive of the terminating party is irrelevant.”
 
 Sons of Thunder, Inc. v. Borden, Inc.,
 
 148 N.J. 396, 690 A.2d 575, 588 (1997) (citing
 
 Karl’s Sales and Service, Inc. v. Gimbel Bros., Inc.,
 
 249 N.J.Super. 487, 592 A.2d 647, 651 (App.Div.1991).) The Court has already determined that Sonic’s right to terminate was expressly provided for in the Second Amendment. In addition, the Court has concluded that Sonic acted within its authority under the termination provision in light of the Tower Lease and shareholder approval concerns.
 

 While New Jersey law implies into every contract a covenant of good faith and fair dealing,
 
 See Pickett v. Lloyd’s,
 
 131 N.J. 457, 621 A.2d 445 (1998), there is no evidence that Sonic breached this duty. The obligation to perform in good faith requires that neither party do anything which will interfere with or destroy each party’s reasonable expectations under the contract.
 
 Sons of Thunder,
 
 690 A.2d at 586, 588. Clearly, Sonic’s termination of the agreement did not offend ACRA’s
 
 reasonable
 
 expectations of consummating the sale. For instance, before the February 17,1998 final notice of termination,. Sonic had informed ACRA, on two separate occasions, that it would not close the sale. Thus, ACRA cannot assert any genuine surprise that the sale ultimately was. not effectuated. This is particularly the case given that the express and unambiguous terms of the Second Amendment granted Sonic sole discretion to terminate the contract respecting issues of title and survey. In light of the Tower Lease and shareholder approval concerns, which effectively made it improbable for ACRA to deliver to Sonic the necessary affidavit of title, ACRA could not reasonably expect Sonic to close the agreement.
 

 The recent case,
 
 Sons of Thunder,
 
 does not require a different conclusion. In
 
 Sons of Thunder,
 
 the New Jersey Supreme Court held that “a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate.” 690 A.2d at 588. Plaintiff Sons of Thunder, Inc. had entered into a contract with defendant Borden, Inc. for the' sale of shell stock. Under the contract, Borden agreed to purchase a minimum quantity of shellfish at market price for a period of up to one year. At the end of the first year, the contract automatically was to renew for a period up to five years. The contract provided, however, that either party could cancel the contract by giving written notice of termination ninety days before the effective cancellation date.
 
 Id.
 
 at 578.
 

 Plaintiff initially encountered obstacles in obtaining a loan to finance a second boat necessary for harvesting shell stock to Borden. During this time, Borden’s management underwent changes. Although the new management team supported plaintiffs loan application to a bank, the team later expressed intentions of not honoring Borden’s contract with plaintiff. Ultimately, plaintiff obtained the necessary funding, and it was able to supply Borden with shellfish as provided for under the contract. Borden, however, began to de
 
 *511
 
 crease its purchases from plaintiff and later even lowered the price it paid for the shellfish purchased. In addition, Borden began sending plaintiffs boats out to harvest claim only in inclement weather. Ultimately, Borden notified plaintiff that it was terminating the contract. The notice of termination complied with the time limitations under the contract.
 

 Plaintiff filed a breach of contract action against Borden, alleging
 
 inter alia
 
 that it had failed to buy the required amount of shell stock and to pay the contractual price thereof prior to termination of the contract. Plaintiff later amended its complaint to add a claim for breach of the implied covenant of good faith and fair dealing.
 

 The case proceeded to trial, where the jury returned a verdict in favor of plaintiff, finding that Borden had breached the contract prior to termination and had breached its duty of good faith. In addition, the jury found that Borden’s termination of the contract was authorized under the express terms of the agreement.
 

 After the verdict, Borden filed a motion for judgment notwithstanding the verdict, arguing that a party cannot be found liable for breach of the duty of good faith and fair dealing when the party terminates the contract pursuant to an express termination clause. The trial court denied Borden’s motion, reasoning that the issue of good faith required consideration of Borden’s conduct throughout the entire life of the contract and not solely its conduct respecting termination.
 

 On appeal, the appellate division reversed, holding that “the right of Borden to terminate the contract on ninety-days notice in accordance with its express terms cannot be overridden or eliminated by an implied covenant of good faith and fair dealing.”
 

 The New Jersey Supreme Court reversed the decision of the appellate division, holding that a party may breach the implied covenant of good faith and fair dealing in performing its obligations under a contract even when it exercises an express and unconditional right to terminate. 690 A.2d at 588. The court agreed with the appellate division that “the implied covenant of good faith and fair dealing cannot override an express termination clause.”
 
 Id.
 
 at 586. The supreme court further recognized that a party’s motive in terminating a contract is irrelevant where it does so pursuant to express and unambiguous terms in the contract.
 
 Id.
 
 at 588. Nonetheless, the court concluded that a jury reasonably could find that Borden had breached its duty of good faith, not by terminating the agreement, but based on its conduct preceding cancellation of the agreement, namely its refusal to buy the required amount of clams.
 
 Id.
 
 at 589.
 

 In reaching this conclusion, the supreme court sought guidance from a decision by the Fourth Circuit Court of Appeals. In
 
 United Roasters, Inc., v. Colgate-Palmolive Co.,
 
 649 F.2d 985 (4th Cir.1981), the Fourth Circuit found that Colgate had violated its duty of good faith under North Carolina law, notwithstanding its express right to terminate the contract. Like
 
 Sons of Thunder,
 
 the contract in
 
 Colgate
 
 involved the parties’ duties and rights respecting goods. In addition, the contract provided Colgate with the absolute right to terminate upon thirty days notice. Pending that Colgate violated its duty of good faith, the Fourth Circuit explained:
 

 What is wrong with Colgate’s conduct ... is not its failure to communicate a decision to terminate ..., but its cessation of performance. Clearly it had an obligation of good faith performance up until its right of termination was actually effective. The contract expressly obliged it to use its best efforts in the promotion of Banbeanos. Instead of doing that, it simply ceased performance.
 

 Id.
 
 at 990.
 

 Thus,
 
 Sons of Thunder
 
 and
 
 Colgate
 
 both stand for the proposition that a party must continue in good faith to perform its obligations under an existing contract until the
 
 *512
 
 final hour when termination of the contract, even pursuant to an express and absolute right to terminate, takes effect. In the instant case, Sonic’s only existing obligation to ACRA was to exercise good faith in performing inspections to the property and reviewing their results. ACRA has presented no evidence indicating that Sonic breached this duty. To the contrary, Sonic’s willingness to suspend cancellation of the agreement on two separate occasions in order to continue with title and survey inspections evidences a sincere interest in closing the sale. The existence of certain title defects, however, effectively deflated this interest. Sonic’s motion for summary judgment as to the bad faith claim will be granted.
 

 2. Defendant Speedway
 

 In its amended complaint, ACRA also asserts a bad faith claim against Speedway. As the Court already has explained, Speedway’s obligation to ACRA never materialized.
 
 See supra
 
 part E. Moreover, ACRA has failed to present any evidence that Speedway, who was not a party to the agreement, acted in bad faith. Thus, summary judgment as to the bad faith claim also will be granted for Speedway.
 

 III. CONCLUSION
 

 For the reasons stated above, defendants Sonic and Speedway’s motions for summary judgment dismissing all counts will be granted. The* Court will enter an appropriate order.
 

 [1]
 

 . Although both Sonic and Speedway, who share the same counsel, have filed motions for summary judgment, the original notice of motion named only Sonic as a moving party. This notice was amended on February 16, 2000, adding Speedway as a moving party. In light of this amendment, the Court extended to ACRA additional time with which to respond to Speedway's motion. Declining this invitation, ACRA represented by letter to the Court that notwithstanding the omission of Speedway from the original notice of motion, ACRA was aware that both defendants were filing motions at the time it submitted its original opposition brief, and therefore it will rely solely upon the arguments contained therein.
 

 [2]
 

 . Fed.R.Civ.P. 9(b) provides, "In all aver-ments of fraud ..., the circumstances constituting fraud shall be stated with particularity-”
 

 [3]
 

 . In its supporting brief, defendant Speedway states that it relies upon and therefore incorporates the arguments set forth in Sonic’s brief.
 
 See
 
 Speedway’s Supp. Br. at 4. Thus, for the sake of simplicity, the Court will refer only to Sonic in addressing both defendants’ motions.
 

 [4]
 

 . The original complaint provided: Upon information and belief, defendants and/or persons acting under their direction or control provided notice to certain C-E employees other than plaintiffs, during the VESP opt-in period, that C-E was in the process - of planning and promulgating VSIP.
 

 [5]
 

 . Plaintiff’s amended complaint alleged: Upon information and belief, defendants and/or persons acting under their direction or control provided notice to certain C~E employees other than plaintiffs, during the VESP opt-in period, that C-E was in the process of planning and promulgating VSIP. These employees include, but are not limited to, Arnold Allen, Walter J. Dempsey, S. Lewis Bernheim, members of upper management, all employees in the Construction Group, the Estimating Department and the Personnel Department in Bloomfield, New Jersey, and certain employees located in Houston.
 

 [6]
 

 . In both its complaint and opposition brief, ACRA alleges that defendants made fraudulent representations, upon which ACRA relied to its detriment. Plaintiff makes no allegation that defendants wilfully omitted material facts. Thus, the Court will not address a claim for fraudulent concealment.
 

 [7]
 

 . In light of the foregoing, the Court need not address the remaining elements of fraud.
 

 [8]
 

 . Sonic alleges that the following matters related to title and survey: (1) lack of access to the Wrangleborough and Prague Roads, (2) threat by condominium association to bring suit enjoining construction of race track, and (3) existence of asbestos on the property and removal of petroleum tank. The Couit disagrees.
 

 Under the agreement, the survey “shall certify to Buyer the metes and bounds description of the Property and the acreage contained with the Property to the nearest hundredth of an acre, and shall be used to prepare the deed to the Property described in Paragraph 1 hereof.” Defs.’ Ex. A at 11. Thus, the survey clearly was intended to affix for descriptive purposes the outer parameters of the property. Issues regarding off-site conditions, such as the location of public roads, therefore do not appear to fall within contemplation of the survey. Moreover, whether the property had direct access to certain roads was a matter easily ascertained through physical inspection, which Sonic already had approved.
 

 Upon learning of the proposed sale and intended use of the Property, the Timberland Condo Association (“the Association”) allegedly threatened to seek an injunction against Sonic's construction of the race track, which Sonic argues created a title problem. “Unmarketable title” has been found to exist where “it is reasonably probable that the purchaser would be exposed to litigation not of a frivolous nature concerning the title.”
 
 Bel-Air Motel Corp. v. Title Insurance Corp. of Pennsylvania,
 
 183 N.J.Super. 551, 444 A.2d 1119, 1122-23 (L.Div.1981). The subject matter of the Association's possible suit, however, would not concern title to the property. There is no evidence that the Association was asserting any legal interest in the property which would interfere with or otherwise call into question the validity of Sonic's title to the property under the sale agreement. Nor can it be said that the threat of injunction by the Association created a survey problem. Thus, the Court concludes that the Association’s threat of injunction did not create a concern affecting title or survey.
 

 Inspections to the Property revealed that it contained a significant amount of asbestos, which removal would be extremely costly.
 
 *508
 

 See
 
 Defs.’ Ex. P at 78 (estimating that asbestos problem would have costed from $200 to 400 thousand up to $800 thousand). In addition, Sonic learned that ACRA had removed an underground petroleum storage tank from the Property, which removal had yet to be approved by the New Jersey Department of Environmental Protection. While these matters reasonably created concerns for Sonic, these concerns were environmental in nature, which Mr. Rourke, Sonic’s broker, conceded:
 

 Q: Now after the execution of the contract on November 13, 1997, did you begin a process of due diligence?
 

 A: True.
 

 Q: On behalf of Sonic Financial?
 

 A: True.
 

 Q: And can you tell me what that process included?
 

 A: Monitoring the survey, monitoring the Phase I, monitoring the title search, visiting the property.
 

 Q: In any of those processes did you uncover any irregularities?
 

 A: In all of those processes.
 

 Q: Can you tell me what irregularities you uncovered?
 

 A: In environmental. We were told there was very little asbestos in the original racetrack building. It turned -
 

 We were told that there was asbestos in the original stadium, there was very little, and when we got into an extensive study that cost us a lot of money, we found out there was an $800,000 problem. And then they said there was nothing in the horse barn. I got nervous about that. There was a 200 to $400,000 problem. Then we looked at stains around out by the building. There was a tank that was pulled but never closed by the state. Major problem in my mind.
 

 Q: What were the reasons that you proffered for cancelling [sic] the second amendment?
 

 A: Under the category of title survey, we had the tower, we had access to Ran-gleborough Road, we had the location of the off-track betting facility.
 
 Under the category environmental, we had a tank that was still unclosed by the state. The state wasn't coming up with documents. ~We had $1.2 million asbestos problem.
 
 Under the category of zoning or maybe even title, opposition of the Timberglen Homeowners Association.
 

 Id.
 
 at 76-78, 100-101. The Court concludes that the asbestos and tank issues created legitimate concerns, albeit environmental
 

 [9]
 

 . ACRA argues that it was only required to deliver an affidavit “substantially in the form” of the affidavit attached as exhibit 5.b. to the agreement. Notwithstanding this qualification, the actual affidavit of title drafted by ACRA's attorney for the sale of the property contains a provision certifying that "There are no tenants or other occupants of [4501 Black Horse Pike Hamilton Township, Atlantic County, New Jersey].” Dels.’ Ex. A.