**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5464-15T3

CHICAGO TITLE INSURANCE
COMPANY, as subrogee of
GOLDEN UNION, LLC,

     Plaintiff-Respondent,

v.

UNION AVENUE HOLDING,
LLC, ARIEL GANTZ and
STUART BIENENSTOCK,

     Defendants,

and

JUDAH BLOCH,

     Defendant-Appellant.

_____

Argued April 12, 2018 – Decided January 8, 2019

Before Judges Simonelli, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3785-15.

Ronald L. Davison argued the cause for appellant (Starr, Gern, Davison & Rubin, PC, attorneys; Ronald L. Davison and Lisa J. Jurick, on the briefs).

Brian S. Tretter argued the cause for respondent (Fidelity National Law Group, attorneys; Brian S. Tretter, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a bench trial, the trial court entered a $1.3 million judgment in favor of plaintiff, Chicago Title Insurance Company (Chicago Title), as subrogee of Golden Union, LLC (Golden Union), against defendants Judah Bloch, his partner, Stuart Bienenstock, and their company, Union Avenue Holding, LLC (UAH), based on claims of fraud and breach of covenant. Bloch now appeals the judgment entered on July 14, 2016. We affirm.

The dispute arose out of a real estate transaction in which UAH sold an apartment building (the property) to Golden Union for $1.4 million. A condition of the sale was that all liens on the property had to be satisfied prior to or at the closing. West 58th Street, LLC (West 58th Street) and TSR Group, LLC (TSR) held an outstanding $1.1 million mortgage on the property (hereinafter the West 58th Street mortgage). Unbeknownst to Golden Union, defendants delivered a fraudulent discharge of the West 58th Street mortgage to Golden Union at the

closing in order to fulfill the precondition of the sale. Chicago Title issued the title insurance policy.

When Golden Union discovered the fraud and the outstanding lien, it sued UAH, West 58th Street, and TSR. West 58th Street, which was previously unaware of the sale of the property, sued Golden Union, UAH, its principals, Bloch and Bienenstock, and Bloch's business partner and brother-in-law, Ariel Gantz, seeking a declaratory judgment in connection with its mortgage lien, a judgment of foreclosure, and other relief. Golden Union filed a contesting answer, which included affirmative defenses, counterclaims, and cross-claims against UAH, Bloch, Bienenstock, and Gantz, alleging fraud, negligent misrepresentation, and breach of covenant. A settlement of certain claims resulted in West 58th Street's assignment to Golden Union of its claims against UAH, Bloch, Bienenstock, and Gantz. After Chicago Title paid West 58th Street $1.3 million as part of the settlement, it became subrogated to Golden Union's cross-claims and West 58th Street's assigned claims.

At the bench trial conducted on March 8, 2016, plaintiff presented the testimony of Gantz and Steve Fortunato, one of Golden Union's principals. In his defense, Bloch testified on his own behalf. In addition, numerous documentary exhibits were moved into evidence, by stipulation of the parties,

A-5464-15T3

as well as the deposition testimony of Bienenstock, Stephen Friedman, UAH's attorney, Daniel Turetsky, the sole owner of West 58th Street, and Ronald Herbst, West 58th Street's outside counsel.

The evidence showed that on August 15, 2011, UAH executed a mortgage note in the amount of $1.1 million to West 58th Street, which was secured by a non-purchase money mortgage encumbering the property. To further secure the note, on the same date, Bloch, Bienenstock, and Gantz executed a guaranty of payment, and UAH executed to West 58th Street an assignment of leases and rents (assignment of rents) for the property. Both the mortgage and the assignment of rents were recorded on September 12, 2011, in the Essex County Register's Office. On April 9, 2012, West 58th Street assigned the mortgage and the assignment of rents to TSR for ten dollars. The assignment was recorded on June 27, 2012. The validity of this assignment and its recording are unclear in the record.

No payments were made on the note or mortgage to either West 58th Street or TSR. In September 2012, Turetsky and Bienenstock discussed different proposals to restructure the outstanding loan. Email exchanges showed that Bloch was involved to some degree in these discussions. One proposal involved Bienenstock funding Turetsky's acquisition of a U.S. company that bid to buy

bonds on the Tel Aviv Stock Exchange in exchange for Turetsky discharging the West 58th Street mortgage. However, unbeknownst to Turetsky, Bienenstock had already arranged to sell the property to Golden Union and hired Friedman as UAH's counsel in connection with the sale. According to Bienenstock, Bloch was actively involved in all aspects of negotiating the Golden Union deal, while Gantz was merely a passive participant.

Fortunato testified that, based on his conversations with Bienenstock during the negotiations, the sale was contingent upon defendants satisfying all liens on the property prior to or at the closing. According to Fortunato, Bienenstock gave no indication that the satisfaction of any lien was contingent upon some post-closing event. If he had, Fortunato would not have agreed to purchase the property. Thus, when the title binder provided to Fortunato by Ardent Title Group listed the West 58th Street mortgage, Fortunato attempted to obtain a pay-off figure for the mortgage prior to scheduling the closing. However, Friedman advised Fortunato in an email "that he was handling the discharge and the payoff for [the] West 58th [Street mortgage]." In a conference call with Friedman and Bienenstock, Fortunato was assured that the mortgage was going to be discharged pursuant to some other business dealings between the parties. Once "Friedman sent over proposed forms of discharge" and "the

5

title company approved," Fortunato scheduled the closing for September 20, 2012.

At the closing, Fortunato and his business partner, Michael Taormina, both of whom were lawyers, represented Golden Union. Friedman, Bienenstock, and Bloch attended the closing for UAH. Through Friedman, Bienenstock provided Fortunato with an executed discharge for the West 58th Street mortgage, and a termination of the TSR assignment of rents, which referenced the assignment of mortgage to TSR. These documents led Fortunato to believe the mortgage was paid off, and he was purchasing the property with clear title. Although Bloch denied seeing the executed discharges at the closing and denied advising Golden Union that the property was going to be sold with clear title, he testified that he understood Golden Union intended to buy the property clear of any liens.

Taormina signed the HUD settlement statement at the closing as the settlement agent, "responsible for clearing title . . . on behalf of the title company." The HUD statement showed no proceeds of the sale satisfying the West 58th Street mortgage. Bienenstock signed the deed, the seller's residency certification, the affidavit of consideration, and the affidavit of title on behalf of UAH. The discharge of mortgage, which was dated September 19, 2012, and

A-5464-15T3

purportedly signed by Herbst as the authorized signatory for West 58th Street, specified that "[t]he mortgage ha[d] been [paid in full] or otherwise [satisfied] and [discharged]." Although Herbst signed the discharge, the notary acknowledgement, purportedly prepared by Adina Zion, an associate of Herbst's firm, certified that "Eliezer Swertloff personally came before [her] and stated to [her] satisfaction that this person . . . was the maker of the attached instrument; . . . [and] was authorized to and did execute this instrument as the manager of [West 58th Street.]"[1] The termination of assignment of rents was dated September 18, 2012, and signed by Eliezer Swertloff,[2] as manager for TSR. The deed and both discharges were recorded on October 2, 2012.

Approximately four months after the closing, Herbst notified Ardent Title Group and Fortunato that the executed discharge of the West 58th Street mortgage was forged. Herbst demanded that the discharge be voided and the West 58th Street mortgage reinstated to its proper priority. According to Herbst, both his and Zion's signatures were forgeries, neither he nor Zion ever signed the discharge, and Zion's purported notarization was executed with a false

---

[1] Fortunato did not recall whether he noticed the discrepancy at the closing.

[2] Swertloff's name appears alternately in the record as Swerdloff.

stamp. At his deposition, Herbst confirmed the forged signatures but testified that he did not know who was responsible.

Friedman testified at his deposition that he obtained the executed discharge forms from either Bienenstock or Bloch and delivered them at the closing but did not review them. He testified that although he had drafted the discharge forms, he expected either Bienenstock or Bloch to obtain the required signatures for an effective discharge. Bloch denied having anything to do with the forgeries. He also denied bringing the documents to the closing and could not "say . . . who brought [the] documents." Likewise, Bienenstock denied bringing the documents to the closing, denied knowing who brought the documents to the closing, and denied seeing them until after the closing. Bienenstock admitted, however, that the handwriting on the discharge of the assignment of rents "look[ed] very similar to [his] handwriting."

Friedman explained further that when he advised Fortunato that the payoff of the West 58th Street mortgage was being handled through a separate arrangement, he had no specific knowledge about the nature of that separate arrangement. However, his "understanding was always that there was some kind of an arrangement being worked out between [his] clients and the holders of the mortgages." Friedman acknowledged several conversations and email

exchanges between himself, Bienenstock, and Bloch in the weeks and days leading up to the closing in which he discussed with them the terms of the sale. In one email in particular, which was acknowledged by Bloch, Friedman specified that the West 58th Street mortgage had to be released or satisfied by West 58th Street and TSR. According to Friedman, while the net proceeds from the closing, totaling $637,822.22, were insufficient to pay off the West 58th Street mortgage, he related conversations he had with both Bienenstock and Bloch about using the closing proceeds to invest in a company buying Israeli bonds.

Bienenstock confirmed his belief that after receiving the funds from the closing, through the bond purchase, Turetsky would forgive the West 58th Street mortgage. Likewise, Bloch confirmed that the closing proceeds "were to be used to purchase bonds in Israel" in order "to help . . . Turetsky and TSR take control of this company and that . . . [he and Bienenstock] were going to be partners with them in this company." According to Bloch, the arrangement constituted "an asset replacement" for the property encumbered by the West 58th Street mortgage. Notwithstanding his understanding that Golden Union intended to buy the property clear of any liens, Bloch acknowledged he could not wire the closing proceeds to complete the purchase purportedly necessary to

discharge the mortgage until after the closing because the receiving account in Israel had not been established as of the date of the closing. Yet, Bloch denied knowing the West 58th Street mortgage would not be satisfied at or prior to the closing. Gantz also believed that the West 58th Street mortgage would be discharged by sending money to Israel to purchase bonds after the sale of the property.

After denying Bloch's and Gantz' motions for a directed verdict pursuant to Rule 4:40-1, in a thirty-page written opinion issued on July 14, 2016, Judge Stephanie A. Mitterhoff entered judgment against UAH, Bienenstock, and Bloch in the amount of $1.3 million plus pre-judgment interest based on the claims of common law fraud, fraudulent inducement, fraudulent misrepresentation, and breach of covenant. Although the judge dismissed the claims for negligent misrepresentation and negligent breach of covenant based on her finding "that the actions of Bienenstock and Bloch on behalf of UAH were unquestionably intentional[,]" the judge did not award punitive damages. The judge also dismissed all claims against Gantz with prejudice.

Initially, the judge recited the elements to establish a claim for common law fraud as follows:

> Plaintiff must show "(1) a material misrepresentation of
> a presently existing or past fact; (2) knowledge or belief

10

by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Banco Popular N.[ Am.] v. Gandi[,] 184 [N.J.] 161, 172 (2005)[ (]quoting Gennari v. Weichert Co. Realtors, 148 [N.J.] 582, 610 (1997)[)]. Fraud may also be committed by intentional concealment of a material fact that the concealing party has a duty to disclose. In the context of a business transaction, such as in the context of a sale of commercial property, the elements of fraudulent concealment are "the deliberate concealment or nondisclosure by the seller of a material fact or defect not readily observable to the purchaser, with the buyer relying upon the seller to his detriment." State[,] Dep't of [Envtl. Prot.] v. Ventron Corp., 94 [N.J.] 473, 503 (1983).

Fraud is never presumed. Each of the elements of fraud must be proven by clear and convincing evidence. Stoecker v. Ecevarria, 408 [N.J. Super.] 597, [617] (App. Div. [2009).] . . .

. . . .

The elements of a cause of action for fraudulent inducement and fraudulent misrepresentation are essentially the same as those for common law fraud. In order to establish such claims, five elements must be shown:" (1) a material misrepresentation; (2) made with knowledge of its falsity; . . . (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." Metex Mfg. Corp. v. Manson, No. 05-2948, 2008 WL 877870, at *4 (D.N.J. March 28, 2008). The "deliberate suppression or omission of a material fact that should be disclosed, is equivalent to a material misrepresentation." [N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc., 319 N.J. Super. 435, 446 (App. Div. 1998)]. A defendant will not be

11

excused from fraudulent conduct "merely because the plaintiff might have or should have discovered the fraud by its own diligence or investigation."

As to the first three elements, the judge determined

there was a material misrepresentation by both Bloch and Bienenstock, made with knowledge of its falsity, with the intent that Golden Union and its principals would rely on it. The misrepresentation consisted of the failure of Bloch and Bienenstock to disclose to . . . Fortunato and Taormina what both defendants, clearly and convincingly, knew: that the West 58th St./TSR mortgages were not going to be discharged at or before the closing.

To support her determination, the judge found that both Bloch and Bienenstock were aware of the details of the sale and were aware that Golden Union "had demanded the discharge of the mortgages at or before the closing," and that they delivered the forged discharge to the closing knowing the buyer would not close without it and would rely on it in agreeing to close. According to the judge, both Bloch and Bienenstock were equally aware "that the discharge could not occur until the closing proceeds were wired to Turetsky or his representatives in Israel" because both had "participated in the negotiation" with Turetsky and the "(failed) execution of the proposed debt restructure."

The judge found Bienenstock's "denial that he brought the [forged] discharges to the closing" undermined by Fortunato's testimony that Bienenstock delivered the discharges at the closing, and Friedman's deposition

testimony that either Bloch or Bienenstock brought them. The judge also found it "highly likely that Bienenstock forged the document himself, based on his own admission that some of the handwriting on the discharge looked remarkably similar to his own." The judge also determined that Bloch was not credible and rejected "his self-serving testimony at trial concerning his relative lack of expertise and his attempts to shift all blame to his partner Bienenstock[.]"

The judge elaborated:

> Bloch is a far more educated individual who has a degree in economics, and he testified in great detail[,] and clearly was aware of all the mechanics of the transaction. In addition, Bloch had sole control of the business account . . . . It was Bloch who took control of the closing proceeds, had them deposited into the . . . business account, and thereafter wired them to Israel in the apparently thwarted expectation of both he and Bienenstock becoming partners in [Turetsky's] company.
>
> Bloch admitted that he knew the buyer believed the closing would result in his obtaining clear title to the property, which Bloch knew was untrue. Bloch's disavowal of any knowledge that the mortgages were to be discharged at or prior to closing is equally unavailing. Both Bienenstock and Bloch received emails from their attorney, Stephen Friedman, in advance of the closing indicating the necessity of obtaining a discharge of the West 58th St./TSR mortgages. To that end, Friedman had prepared the form of the discharge at the request of both Bloch and Bienenstock. After preparing it, he forwarded the form discharge via email to both Bloch and Bienenstock with

A-5464-15T3

the understanding that they would obtain the signatures required for an effective discharge at the time of closing. The court further finds that Bienenstock and Bloch, desperate to consummate this deal with Daniel Turetsky, each knew that they would be unable to do so without securing the . . . net proceeds from the closing. Thus, Bloch as well as Bienenstock clearly knew and understood that the buyer expected the mortgages needed to be discharged at or before the closing and would not close unless they were discharged. The court finds that Bienenstock and Bloch made a decision to induce the buyer into believing the mortgages were discharged in order to take possession of the closing proceeds and consummate their deal with Turetsky. Bloch's understanding of this is further supported by his evasiveness when asked at trial whether he knew the West 58th St[reet] mortgage was going to be discharged prior to closing, to which he responded[,] "I did not know specifically what would be satisfied as far as I knew the mortgage holder was TSR." . . . Clearly, he understood something was to be discharged at the closing, and the court finds he actually knew exactly what was to be discharged based on his and his partner Bienenstock's review of the discharges. The discharges were prepared by Friedman at the request of Bloch and Bienenstock, emailed to both Bloch and Bienenstock, and regardless of who forged the document, the court finds both Bloch and Bienenstock knew that to induce the buyer to close, the discharges had to be executed and presented to the buyer at or before closing. Thus, the first three elements of a cause of action are satisfied as to Bloch and Bienenstock.

The judge also found the fifth element of fraud, damages, "clearly . . . satisfied." As to the fourth element, reasonable reliance, Bloch contended that because Chicago Title's settlement agent, Taormina, who was also an attorney

14

and principal of Golden Union, handled the closing, reviewed the documents, and certified to Chicago Title that all of the insurance commitment requirements were satisfied, Taormina's failure to discern the discrepancy on the discharge defeated any finding of reasonable reliance as a matter of law. In rejecting Bloch's contention, the judge stated:

> In that regard, a defendant will not be excused from fraudulent conduct "merely because the plaintiff might have or should have discovered the fraud by its own diligence or investigation[.]" Moreover, the court finds that Golden Union acted reasonably diligently in demanding the form of discharge, obtaining the form of the discharge, obtaining approval from the title company for the proposed discharges, and receiving an executed discharge at closing. That [p]laintiff did not discern that it was being defrauded by [d]efendants with a forged discharge, the court concludes, does not defeat Golden Union[']s claims for fraud.
>
> . . . .
>
> Although there was a discrepancy [on the executed discharge form], . . . that discrepancy alone does not defeat the fraud claims. Rather, in light of assurances, both explicit and implicit, by Bloch, Bienenstock and their attorney[,] Stephen Friedman[,] that the mortgage was discharged at closing, the court finds that [p]laintiff's reliance on these assurances was reasonable under the circumstances. Based on all the circumstances, the court finds that Golden Union did

not know that the discharge was false, nor was the falseness of the discharge obvious.[3]

Turning to the breach of covenant claim, citing <u>Mayte v. Nemecz</u>, 131 N.J.L. 173 (1944), the judge noted that "[u]nder New Jersey law, if a bargain and sale deed contains a warranty as to the grantor's acts, and the subject property is encumbered as a result of actions taken by the grantor, then the grantor is liable to the grantee when the deed is given." Further, according to the judge, under <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 420 (1997), and <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 251 (2001), "a covenant of good faith and fair dealing is implied in every contract in New Jersey[,]" and "[a] party breaches this implied covenant 'if the party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract[,]'" respectively.

The judge found "ample credible evidence to support [p]laintiff's claims based on the breach of the covenant in the warranty as [d]efendants conveyed

---

[3]    Moreover, actual reliance, as was present here, is sufficient as a matter of law to establish common law fraud.  <u>Union Ink Co. v. AT&T Corp.</u>, 352 N.J. Super. 617, 646 (App. Div. 2002) ("Common law fraud requires a showing of actual reliance, but not objectively reasonable reliance, since the perpetrator of a fraud may not urge that the victim should have been 'more circumspect or astute.'" (quoting <u>Jewish Ctr. of Sussex Cty.</u>, 86 N.J. at 626 n.1)).

title knowing the West 58th [Street mortgage] remained as an encumbrance on the property." The judge explained "the issue [was] not whether [p]laintiff[] [was] misled, but whether the statements in the warranty were true, which clearly they were not." According to the judge, "[a]s a result, [p]laintiff was deprived of the expected fruits of the contract; namely, clear title to the property[,]" and "[d]efendants['] claim that [p]laintiff knew of the existence of the mortgage and the assignment to TSR" did not absolve defendants of "their duties arising from the covenant in the deed." The judge entered a conforming judgment and this appeal followed.

On appeal, Bloch argues the judge's "findings of fact were totally unsupported by the credible evidence in the record[,]" and despite "correctly articulat[ing] the elements of [the] causes of action," her "application of the law . . . to the facts was clearly erroneous." He asserts that "[d]espite the absence of any proof . . . that [he] was involved in obtaining or even knew about the forgery, and despite [his] uncontroverted testimony that he was completely uninvolved with and unaware of the forgery," the judge "nevertheless concluded that he, along with . . . Bienenstock, participated in procuring the forged discharge." Furthermore, the judge's "conclusion that Golden Union and its principals . . . reasonably relied on the discharge of mortgage bearing the forged signature . . .

was also not supported by the credible evidence in the record." We disagree and affirm substantially for the reasons set forth by Judge Mitterhoff in her comprehensive and well-reasoned written opinion. We add only the following brief comments.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We owe "deference to those findings of the trial judge which are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Although, a trial judge's interpretation of the law is "not entitled to any special deference[,]" Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we "'do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting

Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). Here, Judge Mitterhoff's factual findings are well-supported by the competent evidence in the record and her interpretation and application of the law are unassailable. Thus, we find no basis on which to intervene.

Bloch also argues that because UAH alone was "named as a defendant in the breach of covenant counts," the court "lacked jurisdiction to enter judgment against him on the breach of covenant claim." We agree with plaintiff that the court did not enter judgment against Bloch on the breach of covenant cause of action. Rather, in the judge's discussion of the breach of covenant claim, the judge specified that "[p]laintiff allege[d] that in the deed to Golden Union, UAH warranted that it had done no act to encumber the [p]roperty" when, in fact, "the mortgage remained a lien on the premises." Thus, in accordance with the judge's opinion, the judgment was "entered in favor of plaintiff, Chicago Title Insurance Company on its claims for common law fraud, fraudulent inducement, fraudulent misrepresentation, and breach of covenant[.]" It was further ordered "that judgment be entered . . . against [d]efendants [UAH], . . . Bloch and . . . Bienenstock, jointly and severally, in the sum of [$1.3 million]."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5464-15T3